**ROBERT W. STARK, JR., INC., et al.,**
**Plaintiffs,**

v.

**NEW YORK STOCK EXCHANGE, INC.,**
**et al., Defendants.**

**No. 72 Civ. 2528.**

United States District Court,
S. D. New York.

July 20, 1972.

---

Cadwalader, Wickersham & Taft by George D. Reycraft, Haven C. Roosevelt, New York City, for plaintiffs.

Milbank, Tweed, Hadley & McCloy by William E. Jackson, Isaac Shapiro, Floyd E. Brandow, Jr., Russell E. Brooks, New York City, for defendants.

Securities and Exchange Commission by G. Bradford Cook, Chicago, Ill.

## OPINION

BRIEANT, District Judge.

This cause, which has not yet been assigned to a Judge of this Court for all purposes, pursuant to Rule 4(A) of the new Calendar Rules, effective July 1, 1972, is before me pursuant to Calendar Rule 6(B) as a civil emergency matter. Plaintiffs seek a preliminary injunction pending trial of this action, enjoining defendant New York Stock Exchange, Inc. ("NYSE") from enforcing an order of expulsion after a hearing, which will become effective at the close of business on July 21, 1972, but for the intervention of this Court, and which will withdraw approval of plaintiff Robert W. Stark, Jr. ("Mr. Stark") and Robert W. Stark, Jr., Inc. ("Stark, Inc.") as a member and member corporation, respectively, of NYSE.

The complaint contains causes of action pleaded as arising under the anti-trust laws (The Sherman Act—15 U.S.C. §§ 1 and 2). It seeks treble damages and a permanent injunction against continuing violation of the anti-trust laws. Jurisdiction is based on the Clayton Act, and particularly 15 U.S.C. §§ 15, 22 and 26.

The Securities and Exchange Commission ("SEC") has appeared by its General Counsel and has been heard by the Court as *amicus curiae*. The SEC opposes any preliminary injunctive relief, and suggests to the Court that "the exchanges should be allowed to enforce their rules."

Plaintiff Kansas City Securities Corporation ("Kansas City") is a Missouri corporation with its principal office at Kansas City, Mo. Stark, Inc. is an Iowa corporation having its principal office in this District.

Defendant NYSE is a "registered national securities exchange" as defined by § 6(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78f(d), and is a New York not-for-profit corporation having its principal office at 11 Wall Street in the City of New York. The individual defendants are officers and members of NYSE.[1]

The complaint, which charges an antitrust conspiracy to keep plaintiffs and institutional investors generally from access to the market, includes in addition as co-conspirators, other members and affiliates of NYSE, not known to the plaintiffs.

The first cause of action is asserted solely by Kansas City. As Kansas City is not a movant in the instant application, that portion of the complaint will not be summarized, except to note that it does allege a justiciable controversy within the jurisdiction of this Court, and asserts damages in excess of a million dollars, as well as threatened continued damages in excess of one million dollars per annum. Plaintiffs also claim that Kansas City is "entitled to recover threefold its damages", together with reasonable attorneys' fees (¶ 42 of the Complaint).

All of the plaintiffs assert the second cause of action based upon occurrences consequent on the unauthorized recapitalization of Stark, Inc. with Kansas City as its source of new capital. This recapitalization agreement, dated January 3, 1972, was submitted promptly to NYSE for prior approval as required by the NYSE Rules. It is alleged that between January 3, 1972 and May 22, 1972 (when Stark, Inc. took unauthorized unilateral action with respect to its capital structure), defendants refused to reject or approve the proposed recapitalization pursuant to the January 3, 1972 agreement, and that such refusal was malicious, wilful and unlawful, and had as its purpose effectuation of the alleged unlawful anti-trust conspiracy, and specifically, the exclusion of plaintiffs from access to NYSE facilities and advantages.

Failing receipt since January 3rd of a definitive ruling with respect to its proposed agreement of recapitalization with Kansas City, Stark, Inc. on May 22, 1972 implemented the recapitalization unilaterally. At this time, Mr. Stark, who prior to May 22nd controlled Stark, Inc., reasonably believed, on the advice of eminent counsel, that defendants were attempting, wilfully, to impede implementation of a proposed recapitalization plan which plaintiffs and their counsel believed was lawful in all respects. Plaintiffs at that time knew, or had reason to know, that the proposed plan violated Rule 318 of the Board of Governors of the NYSE, but they believed Rule 318 to be void and *ultra vires*. They believed in good faith and still believe, that in the ultimate litigation of their rights, the position they take, namely, that Rule 318 is void and its enforcement unlawful, will be sustained.

In full faith of the justice of their cause, they plunged in intentionally, and in order to test their rights in this Court. In so doing, they knowingly violated Rule 318 and also the ancillary rules prohibiting changes in the Certificate of Incorporation or the capitalization of the member corporation without prior approval.

On May 26, 1972, pursuant to the Constitution of NYSE, separate written charges, annexed as exhibits to the complaint, were preferred against Mr. Stark and Stark, Inc. Charge I thereof has been dismissed. Under Charge II Mr. Stark was charged with "conduct inconsistent with just and equitable principles of trade" in that he caused the violation of Rule 318 of the Board of Governors because he, by the recapitalization of Stark, Inc. permitted Kansas City, "a corporation whose primary purpose is not the transaction of business as a broker or dealer in securities" to become a "parent" of Stark, Inc.

Mr. Stark was also charged on the same facts (Charge III) with misconduct in that he caused the violation of Rule 318 of the Board of Governors by permit-

---

1. Defendant Felix G. Rohatyn is not a member of the Board of Governors. See Answer, ¶ 5.

ting a corporation that has not been for the last two years registered with the SEC as a broker dealer in securities to become a parent of Stark, Inc.

Charge IV asserts a violation of Rule 320(e) (2) of the Board of Governors in that Mr. Stark had caused or permitted Stark, Inc. to issue securities (to Kansas City) without the prior written approval of the NYSE.

Charge V accuses Mr. Stark of a violation of Rule 313(b) of the Board of Governors, by causing or permitting the recapitalization agreement of Stark, Inc. to be consummated, and the related amendment to the Certificate of Incorporation of Stark, Inc. to become effective, in the absence of prior approval by NYSE.

Charges against Stark, Inc., five in number, are *in pari materia*. Charge I was dismissed. The remaining charges assert that Stark, Inc. is in violation of the Constitution of the NYSE, in that it has a parent whose primary purpose is not the transaction of business as a broker or dealer in securities; breach of Rule 318 (non-broker-dealer parent); breach of Rule 320(e) (2) (issuance of securities without prior written approval of the NYSE); and breach of Rule 313(b) (consummation of the recapitalization agreement and amendment of its Certificate of Incorporation without prior approval).

The Board of Governors, after a joint hearing, apparently conducted in all respects in accordance with the rules and customs of the NYSE, and generally in compliance with the requirements of procedural due process, voted to sustain all remaining charges and to expel Mr. Stark and Stark, Inc. from membership, and withdraw approval of them as Member and Member Corporation of NYSE, respectively.

A hearing has been held on this application, and the essential facts are not in dispute and are as herein stated. The parties appearing before me express no desire to offer additional testimony or evidence, except that each side of the litigation has proffered expert testimony of broker-dealers and economists on the question of whether Rule 318 of the Board of Governors of NYSE is an unreasonable restraint on competition, and plaintiffs have offered to show that no such rule is applied in various other exchanges, including the American Stock Exchange, the Pacific Coast Stock Exchange, the Philadelphia-Baltimore-Washington Stock Exchange, the Midwest Stock Exchange and the Boston Stock Exchange, that those exchanges function successfully without the benefits of Rule 318 of the Board of Governors, and no mischief results thereby.

The Court does not believe that this difficult issue may be or need be resolved in connection with determination of this motion for preliminary relief pending trial. That controversy goes to the essence of this lawsuit. Thill Securities Corp. v. New York Stock Exchange, 433 F.2d 264 (7th Cir. 1970). It is an issue upon which the SEC has not had the opportunity to apply its administrative expertise. Under the circumstances, the interests of justice do not require me to take evidence on those complicated questions for purposes of this application, and indeed it would be premature for any such judicial determination to be made at this time with respect to these great economic and legal issues without giving the parties the opportunity for preparation and pre-trial discovery. Suffice it to say that the issues raised present "fair ground for litigation and thus for more deliberate investigation", Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1963); Thill Securities Corp. v. New York Stock Exchange, *supra*; Cowen v. New York Stock Exchange, 371 F.2d 661 (2d Cir. 1967).

Rule 318 of the Board of Governors as it presently exists, together with those relevant interpretative rulings made by that Board, are as follows:

"RULE 318. Other Connections of Members and Allied Members

The primary purpose of every member organization, and any parent of any member corporation, shall be the transaction of business as a broker or dealer in securities. With the prior approval of the Exchange, member organizations may engage in any activities kindred to the securities business.

No member corporation shall have as a parent any party (other than a member or allied member of such member corporation) unless, for a period of not less than two years, the primary purpose of such party has been and continues to be the transaction of business as a broker or dealer in securities, and such party is and continues to be registered with the Securities and Exchange Commission as a broker or dealer in securities under the Securities Exchange Act of 1934 and promptly files with the Exchange a copy of its registration statement under said Act and of each amendment thereto.

Unless otherwise permitted by the Exchange every individual member must be actively engaged in the securities business and devote the major portion of his time thereto, and every member and allied member in a member organization must be actively engaged in the business of his organization and devote the major portion of his time thereto.

Without prior approval of the Exchange, no individual member and no member or allied member in a member organization shall become:

(1) A partner in any non-member business organization;

(2) an officer or employee of any non-member business corporation, firm or association;

(3) an employee of any firm or individual engaged in business; or

(4) associated with any outside securities, financial or kindred business.

\* \* \* \* \* \*

. . . Supplementary Material:
The Board of Governors has determined upon the following permissible exceptions:

(1) Director of corporation not in the securities business;

(2) chairman of a board of directors of a corporation not in the securities business;

(3) officer of personal holding company not publicly owned;

(4) officer of operating company not in the securities business, if duties are nominal and not operational;

(5) officer of an investment trust, open end or closed, if it is not self-managed and self-distributing;

(6) officer, for a reasonable period, of an operating company whose securities the firm underwrote, distributed or sponsored; and

(7) affiliations of members and allied members existing on December 31, 1956.

\* \* \* \* \* \*

Definitions—For the purposes of this Rule, a member organization's, or its parent's activities shall be considered to be the "transaction of business as a broker or dealer in securities" when such member organization including its approved corporate affiliates and subsidiaries, or its parent, as the case may be, acts as a Floor trader, specialist, so-called "two dollar broker", odd lot broker, arbitrageur, or holds itself out to, and transacts business generally with, the public as a broker or dealer in securities, including servicing customers' accounts and introducing them to another member organization. A member organization's, or its parent's, "primary purpose" shall be presumed to be the transaction of business as a broker or dealer in securities, if its gross income (including, in the case of a member organization, the gross income of its corporate affiliates and subsidiaries controlled by the member organization) from activities of the type described in the preceding sentence and from interest charges imposed with respect to debit balances in customers' accounts is at least 50% of its total gross income (including, in the case of a member organization, the gross income of its corporate affiliates and subsidiaries controlled by the member organization). Any member organization, and any par-

ent of a member corporation, whose gross income fails to satisfy the above requirement shall be presumed not to have as its primary purpose the transaction of business as a broker or dealer in securities. Any such presumption may be rebutted by evidence but shall continue until a determination to the contrary has been made by the Board of Governors.

The term "parent" means any party who has the power to exercise controlling influence over the management or policies of a member corporation, unless such power is solely the result of an official position with such member corporation. Any party who owns beneficially, either directly or indirectly, more than 25% of the voting securities of a member corporation, or more than 25% of the outstanding voting securities of any other corporation which directly or through one or more subsidiaries owns beneficially more than 25% of the outstanding voting securities of the member corporation, shall be presumed to be the member corporation's parent. Any party who does not so own more than 25% of the voting securities of a member corporation shall be presumed not to be such corporation's parent. Any such presumption may be rebutted by evidence but shall continue until a determination to the contrary has been made by the Board of Governors."

The Court has reviewed the minutes of the hearing before the Board of Governors. Defendant Huntoon testified, and was available for cross-examination. He was responsible for the administration of the Rules in the Department of Member Firms, and was the person to whom documents are submitted by member organizations for NYSE review.

He had a standard practice in connection with proposals by a member firm to issue non-voting securities to an outside investor. It was his invariable practice to hold meetings, talk by telephone, and collect relevant information and documents so as to have a "complete picture of the proposal" (Board of Governors transcript p. 15). In order to be able to have the staff give an affirmative recommendation to the Board of Governors, with respect to any proposal, substantial changes were frequently "negotiated" between staff and applicant before a proposal was submitted to the Board of Governors.

Mr. Huntoon's testimony shows that "economic control" is the criterion applied to determine whether the requirements of Rule 318 are met where non-voting stock is involved. In any situation under which the investor can "put" the purchased stock back to the issuer, and force him to buy it, an element of control would exist. The degree to which the same investor supplies the business for the firm, is also considered in determining whether the proposed investor has such "control" as to constitute it as a "parent" under Rule 318. Profit participation standing alone has not been deemed to constitute control.

Mr. Stark has been a member of NYSE since 1959. Apparently, he practiced his calling without criticism and was never, prior to this proceeding, the subject of any charges or disciplinary action by the NYSE.

In July, 1971, after approval first obtained from the Board of Governors, he formed his own firm, plaintiff Stark, Inc. Stark, Inc. did not have a substantial public following; its primary customer was Kansas City, and organizations related or affiliated with Kansas City to the extent of almost 100% of business transacted. It is undisputed that this conduct by Mr. Stark of the affairs of Stark, Inc. was not in violation of any NYSE rules. Original capitalization of Stark, Inc. consisted of $100,000.00, of which one-third was represented by issuance of non-voting stock to plaintiff's wife, and the balance, by his own common or voting stock purchased with funds borrowed from Mrs. Stark. Mr. Stark also contributed use of his membership, or "seat".

Kansas City is a wholly owned subsidiary of Waddell & Reed, Inc. Kansas City is a registered securities broker and has done business as such since 1965. It is a full member of Pacific Coast

Stock Exchange, Philadelphia-Baltimore-Washington Stock Exchange, Midwest Stock Exchange, and is an associate member of the Boston Stock Exchange. Its business consists entirely of executing transactions for various regulated investment companies ("mutual funds"), managed by its parent Waddell & Reed, Inc.

■ Waddell & Reed, Inc. is an investment advisor, which is wholly owned by Continental Investment Corporation. Neither Waddell & Reed, Inc., nor Continental Investment Corporation derives "at least 50% of its gross income from the transaction of business as a broker and dealer in securities" within the meaning of Rule 318 and supplemental regulations of the Board of Governors, as fairly interpreted by the NYSE. The NYSE has also concluded that the prohibition against a "parent" not engaged primarily as a broker-dealer extends to grandparents and great grandparents. It cannot be said for purposes of this motion that such a conclusion is unjustified. The Rule is directed toward economic realities, otherwise the mere interposition of a shell corporation between the true owner and the exchange member-corporation would allow an unreasonable means of evasion.

After May, 1972, Stark, Inc. continued to transact almost 100% of its business with customers affiliated with Kansas City or Waddell & Reed, Inc. It opened an office in Missouri and attempted to improve the quality of service given to its prime customer. It sought a general or public patronage, but without significant success.

The proposed agreement dated January 3, 1972 provided for recapitalization of Stark, Inc. and amendment of its Certificate of Incorporation. A new non-voting, convertible, preferred stock, 500 shares having a par value of $100.00 per share, was to be purchased by Kansas City for a cash consideration of $1.4 million. The proposed Certificate of Amendment to the Certificate of Incorporation entitled the holders of this convertible preferred stock to 95% of all dividends declared, with the remaining 5% of such dividends available to the holders of common stock. Non-cumulative cash dividends were required to be paid at the end of each fiscal year, aggregating not less than 95% of the net earnings of the firm, and upon dissolution, the convertible preferred holders were to have first call on the full amount paid for their stock, the value of any exchange membership acquired after May 22, 1972, and after the common shareholders shall have received an amount equal to the value of any membership acquired prior to May 22, 1972, Kansas City will receive 95% of all of the remaining assets. This compulsory distribution of the earnings and profits of Stark, Inc. is entitled to substantial weight in balancing the equities on this motion. Kansas City also obtained a "put" entitling it to require Stark, Inc. to reacquire the preferred.

Under the same recapitalization plan, Mr. Stark was to purchase 1,000 additional shares of Class A common (voting) stock for a cash consideration of $500,000.00. *All of the money* to buy this additional stock was generated by a demand promissory note (later changed to thirty days after demand) payable by Mr. Stark to Kansas City or its nominee.

Early in May of 1972, one Atwell, an individual formerly associated in a substantial capacity with Kansas City, became a shareholder of one share of common stock. This fact was not relied upon by the Board of Governors, but represents an additional element of control, to the extent that Iowa corporate law grants to a common shareholder any special standing to sue or to object to corporate conduct.

Under the circumstances of this recapitalization, it cannot be disputed that those who control Kansas City also control Stark, Inc. Control, for the purposes of Rule 318, means control as a practical or economic matter, rather than a matter of corporate law. Kansas City has life or death power and can terminate the

operations of Stark, Inc. immediately by any one or more of the following acts: (a) stop placing orders; since Kansas City provides almost 100% of the transactions of Stark, Inc., lack of a customer will close the business, (b) exercise the "put" with respect to the preferred stock; unless Stark, Inc. could come up with a new source of capital in order to comply with the terms of the "put", it would have to stop doing business, (c) call, on thirty days notice, the promissory note of Mr. Stark for $500,000.00, which was used to purchase common stock; Mr. Stark has no such independent financial means as would permit him to comply with the demand except by closing the business.

■ The power to close down the firm certainly carries with it the power to control its operations. This constitutes a clear violation of Rule 318, and constitutes the type of change in capital structure which it is perfectly reasonable that the NYSE should be permitted to analyze and explore in depth before granting approval or disapproval. In the instant case, Stark, Inc., did not give the NYSE the full opportunity to analyze and suggest changes or corrections in the proposed recapitalization plan, and those alternatives which were suggested by NYSE, even up to the last day for submission of this controversy to the Court were found uniformly unacceptable by Kansas City and Stark, Inc.

There is another aspect of the proposed recapitalization, which while not directly violative of Rule 318, might well be noted at this point; the compulsory provisions for the distribution of net profits and the allocations of proceeds on dissolution, in each case 95% to the preferred stockholder, operate in effect as a "rebate" as to commissions charged on those stock exchange transactions where the commission rate is fixed by rule. The whole recapitalization is nothing more than a scheme to get a rebate. In each of those transactions, after paying the regular commission such as other institutional investors will be required to pay, Kansas City or its parents and grandparents and

their affiliates, will enjoy the additional advantage of a "rebate" in that Kansas City will "recapture" 95% of the net profits generated on all such commission business, plus interest on its promissory note.

This motion for a preliminary injunction in effect seeks to have the Court sanction this continuous rebate procedure pending the trial of this action, which may occupy some period of time, and this is a matter which must be considered in balancing the equities and determining whether or not a preliminary injunction should issue.

Extensive correspondence exchanged between defendant Huntoon, and persons acting from time to time as attorneys for Stark, Inc. has been annexed to the various papers read on this motion.

The proposed reorganization of Stark, Inc., increased its capital from $100,000.-00 to $2,000,000.00. This substantial change, particularly in view of the participation by Kansas City therein, and its publicly known relationship to "institutional investors" warranted careful scrutiny of the proposal by NYSE staff before submission to the Board of Governors.

Kansas City had previously applied to NYSE to become a member corporation and its application had been rejected, in reliance on Rule 318.

■ Mr. Stark charges in his affidavit, sworn to June 14, 1972, read in support of this motion, that the projected recapitalization was a subject of "harassment" by the NYSE staff, and that the staff attempted to "procrastinate indefinitely" and to deny him a fair hearing by the Board of Governors.

It appears that immediately following submission of the proposed recapitalization on January 3, 1972, NYSE staff and Mr. Stark and his counsel were granted an early conference on the subject matter of the application. This conference was held on January 13, 1972. Defendant Huntoon and the lawyers for Stark, Inc. thereafter engaged in a prolific exchange of correspondence.

Plaintiffs' contention that there was a wilful desire to procrastinate, and their charges of harassment represent conclusions which simply do not stand up on a reading of the correspondence exchanged, and after consideration of the elapsed time and the importance of the subject matter. Within the exchanges of correspondence, I find no evidence of such harassment or wilful delay and procrastination. On the contrary, these documents show affirmatively to the Court that NYSE staff members, faced with a matter of considerable importance, conducted themselves in ·a reasonable manner. They did not, nor could they, prevent Mr. Stark, a member, from applying directly to the Board of Governors, over the head of the staff.

Notwithstanding this finding, based upon a direct examination of the letters, and the record before the Exchange, that the staff did not deny due process or make plaintiffs an object of harassment, nor did it procrastinate wilfully or unduly, the Court does find that Mr. Stark concluded subjectively, and in good faith,. that perhaps he had been the object of some unjustified delay. In evaluating his personal good faith and integrity for purposes of balancing the equities, I find that although the staff did not harass or procrastinate, he believed in good faith and on advice of counsel, that the staff members had done so from evil motivation.

The SEC, as the agency designated by Congress to regulate the securities industry, has administrative oversight of the content and mode of administration of stock exchange rules. Section 6(a)(4) of the 1934 Act, 15 U.S.C. 78f(a)(4) requires a regulated national securities exchange to file with the SEC copies of amendments to rules. The SEC itself has required all exchanges to file a report of proposed amendments, repeals or modifications of its rules, not less than three weeks prior to taking such action. This requirement exists pursuant to Rule 17a–8 enacted under the 1934 Act, 17 CFR § 240.17a–8, and was in effect when Rule 318 was adopted, and amended.

Furthermore, the SEC under § 19(b) may by order, or by rules or regulations, alter or supplement·the rules and practices of an exchange when they relate to important matters, including the fixing of reasonable rates of commissions. Rule 318 as applied in the case of Stark, Inc. does relate to reasonable rates of commissions, as the Stark, Inc. recapitalization is primarily a means to effectuate a recapture of commissions through having a captive house.

Rule 318, together with other various rules and customs, is presently the subject of a request pending by SEC and NYSE and other exchanges effectuate certain alterations in rules and practices. SEC has submitted to each exchange a proposed exchange rule, and has requested that the exchange adopt the proposal. If the rule is adopted in its present suggested form, Rule 318 may likely be repealed or superceded by the new provisions, and indeed SEC has indicated that when (if ever) such new proposed regulatory scheme is placed in effect, the restrictions of Rule 318 should be abandoned.

Such rules, and directions to the exchanges to make rules, cannot however, because of their far sweeping effect, be adopted in a cursory or incomplete manner, or without having extensive hearings and examination into the subject matter, and without permitting those interested, representing the public and groups in the securities industry an opportunity for a full expression of views. This course is being pursued right at the present time and apparently with diligence.

The Court cannot tell, nor is any representation made by SEC to the Court, that any rules ultimately will be adopted, or what the contents of such rules when adopted will be. There is the distinct possibility suggested that any rules when adopted would not be entirely retroactive; they might contain provisions commonly referred as "grandfather rights" to protect those brokers and dealers who have an established course of business existing prior to the effective date of the proposed rules.

■■ This Court considers that the rule making power of the SEC as granted to it by § 6(d) of the 1934 Act, and § 19 (b) (9), (10) and (13) thereof, empower the SEC to effectuate the establishment of reasonable rules covering the underlying problem of the access by institutional investors to the national exchanges as members, or parents of member firms. The Court notes that persons of prominence in government, including but not limited to Congressman John E. Moss, Chairman of the House Subcommittee on Commerce and Finance of the Committee on Interstate and Foreign Commerce and Senators Harrison A. Williams, Jr. and Philip A. Hart have suggested either that there is no such power residing in the SEC to achieve the adoption and enforcement of such rules, or that such power ought not to be exercised. This Court concludes that there is adequate power in the SEC to take all steps necessary with respect to the access of institutional investors to the NYSE and further believes that this Court should take no step in private litigation which might in any way prejudice the effectiveness of such a scheme, or create any grandfather rights for plaintiffs, or otherwise impair by implication or other, the full and complete right and power of the SEC to do the regulatory work for which it was constituted, in an area of market action which cries out for some rational plan.

■ Reasonable rules which fulfill the need for self regulation of the exchange are *required*. 15 U.S.C. § 78f(b). Since they are an essential part of the statutory scheme, they may, if reasonable and relevant, and fairly administered, be within an implied exception to the antitrust statutes. Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

■ While there is "fair ground for litigation" here (see *supra* p. 10), it appears to the Court that there is very little probability of success shown on the part of plaintiffs in their effort to set aside Rule 318 on anti-trust grounds as applied to the instant "rebate scheme".

The stock exchange has never been a market ouverte; some limitation of access to the market has always been permitted and has survived attack on antitrust grounds for more than a generation. [See Kaplan v. Lehman Brothers, 371 F.2d 409 (7th Cir. 1967)]. In fact, as exchange memberships are limited in number, the "vertical integration" enjoyed by one institutional investor may restrict competition by other institutional investors not enjoying the same financial benefits.

The problem of so-called institutional membership on exchanges, including the problems implicit on the continued enforcement of Rule 318 were made a matter of investigation by the SEC, which scheduled public hearings, first announced August 26, 1971. Affected persons were invited to appear and present evidence, and did so in great extent (consisting mostly of opinion and prediction). On February 2, 1972, the SEC issued a policy statement considering many matters of great import and beyond the scope of this motion. The SEC stated in part as follows:

". . . as a central market system develops, it should have at its heart a corps of professional brokers and market makers serving investors."

". . . institutions should not be permitted to deal through brokerage firms established principally to handle their own transactions but should be required to deal through brokers dedicated primarily to serving and having fiduciary obligations to a broad investing public."

". . . membership in the central market system should be open only to those who meet qualifying standards and who have the primary purpose of serving the public as brokers or market-makers."

"So long as such a structure [of fixed minimum commissions] exists, large investors should not, by virtue of their economic power and size, be entitled to obtain rebates of commissions not available to other investors. While

fixed minimum commissions exist, they should apply to all investors, and an exception should not be given to a particular person."

"Stock exchanges are affected with an overriding national interest which demands that they act to maintain and improve the public's confidence that the exchange markets are operated fairly and openly. The public should have the assurance that a member of an exchange is dedicated to serving the public, and membership by institutions not predominantly serving non-affiliated customers should not be permitted to cloud this objective."

The SEC now suggests to this Court that Rule 318 is not inconsistent with its foregoing findings, and should be enforced in situations such as the instant case until a new and comprehensive rule has been adopted.

Thereafter, and about simultaneously with the recapitalization of Stark, Inc., the SEC, on May 26, 1972, issued a letter to the national exchanges, asking each to change their rules and practices so that every member would have as its principal purpose the conduct of a public securities business. Chairman William J. Casey advised the Subcommittee on Securities of the Committee on Banking, Housing and Urban Affairs of the United States Senate, on April 20, 1972 as follows:

"The explicit language of the Act itself confirms that transactions on exchanges are affected with a national public interest and charges the Commission with maintaining the fairness and honesty of exchange markets. We have interpreted our Congressional mandate to mean that membership on exchanges should be permitted only for those persons or business entities which intend to contribute affirmatively to the trading markets as a public institution. In our view, such affirmative contribution would be satisfied only if a member firm holds itself out to the public as being willing to engage in the traditional functions of executing securities transactions as agent or

to engage in dealer activity which contributes to the liquidity and depth of the trading markets, such as specialist activity."

The proposed rule (attached hereto as Appendix A) contains a definition of relationship with affiliated persons which clearly would include the situation of Stark, Inc. The rule also requires that in order to be engaged in the conduct of a public securities business, at least 80% by dollar value of transactions, be effected for or with persons other than affiliated persons, that is, members of the general public. The SEC has not had an opportunity to review and consider fully all of the possible means by which such a standard could be evaded, or how it is to be implemented.

If and when, after full administrative procedures the SEC does impose such a rule, it will be subject to judicial review at the instance of any exchange or any member thereof, as an agency action, under the Administrative Procedures Act, 5 U.S.C. §§ 702 and 704, and possible also, to the extent of claims of *ultra vires*, or that constitutional rights have been violated, by an action for declaratory judgment.

Against the foregoing procedural background, the SEC strongly urges that "until such time as the exchanges accept the Commission's proposed rule, or the Commission promulgates such a rule, the exchanges should be allowed to enforce their [present] rules, especially where as here, the policies of NYSE Rule 318 overlap the policies of the Commission's proposed modification of that rule."

To recapitulate; under the proposed rules, no member firm can do more than 80% of its business with an affiliate, but there is nothing to prevent a firm from doing 100% of its business with one [non-affiliate] customer, as Stark, Inc. substantially did between July, 1971 and the acts complained of in May, 1972.

■ Nothing currently prohibits an entity more than half of the income of

which is derived from activities as a broker-dealer, from owning, controlling or directing any number of subsidiaries or affiliates which are substantial traders in the market [institutional investors], and are not broker-dealers. Prominent member firms control investment advisers, mutual funds, insurance companies, and banks, without number. Because the broker-dealer is on the top of the pyramid, no violation is now perceived; it is only when the broker-dealer is controlled by a non-broker-dealer that present Rule 318 is broken. This may be, from an economic point of view, a distinction without a difference, but the Court is not prepared to state that the rule is arbitrary, capricious or void. The distinction will disappear if the proposed SEC rule is implemented.

Plaintiffs also urge in support of their application for a preliminary injunction, a contention that by its treatment of others and wilful discrimination inherent in such treatment, defendants may not, in equity, enforce Rule 318 against these plaintiffs. The three other situations cited by plaintiffs appear on their face to be inapposite. The first member organization referred to, differs in that there is no "put" with respect to preferred stock, the promissory note approved by the NYSE is a five-year note, no loan was made, as here, to the common shareholders, and at the time the recapitalization was approved, the non-broker-dealer parent was not executing any trades through the firm. Ultimately, it did, somewhat later, and the NYSE has since limited the amount of business which that firm may do for its parent or affiliates of the parent, to a small portion of total commission business. The NYSE appears to have taken necessary proceedings to correct a minimal failure to comply, by that firm, and its entire situation is factually distinguishable.

Plaintiffs here have expressly declined to restructure their relationships so as to permit Stark, Inc. to limit its business done for Kansas City and its affiliates to 10 or even 20% of gross commissions.

Two other situations involving member corporations are also factually distinguishable, as will appear from details comprised in Stark exhibit 5 in evidence before the Board of Governors. To analyze these other capital structures would unduly prolong this opinion. The Board of Governors considered these other capitalization plans which were approved, not to be violative of Rule 318 under all of the surrounding circumstances, and the Court finds it had a reasonable basis for reaching this conclusion, and failure to approve the Stark, Inc. capitalization is not arbitrary or capricious, nor is it discriminatory in view of such prior approvals.

Based on the foregoing, Stark, Inc. makes an exceedingly thin showing of any likelihood of success on the trial. The most that can be said for plaintiff's position on the anti-trust laws is that a triable issue of fact exists as to whether the totality of restraints on competition imposed by NYSE, inherent in any system for conduct of a national securities exchange, are reasonable in degree, and the further question of whether the exception by implication carved out of the anti-trust laws in the case of Silver v. N.Y.S.E., *supra*, covers the issues here. The challenged Rule 318 has been passed upon by the SEC at least by implication, since such a rule could not have been enacted or amended without prior reference to the SEC for discharge of its regulatory responsibility.

By injunction pending trial, Stark, Inc. would like to obtain, and enjoy indefinitely while the litigation pends, all the relief it will obtain if ultimately successful on the merits.

Plaintiff Stark, Inc. has an adequate remedy at law. It will suffer, at the most, monetary damages for which it will be entitled, if successful, to a threefold recovery. The solvency of the defendants is not at issue.

Stark, Inc. has not demonstrated that the threatened harm of an injunction will not outweigh the possible harm which may result from failure to grant such relief. The record shows the contrary. No such injunction could be grant-

ed to Stark, Inc. without assuring continued discriminatory rebates in favor of Kansas City, to the detriment of all other NYSE members, unless Kansas City would forego its 95% share of profits during such pendency, which it expressly refuses to do. (See transcript pp. 10, 11)

A preliminary injunction will not issue in the absence of a showing of irreparable damages which could not be redressed by money, Thompson v. New York Central Railroad Company, 361 F.2d 137 (2d Cir. 1966).

While Stark, Inc. shows that it expects to do an annual commission business of $2,000,000.00, some of this money will have to be expended for clerks and overhead, and 95% of the net balance is ultimately to be distributed to Kansas City. Under these circumstances, Stark, Inc. does not show any irreparable damage which cannot be redressed in money.

If the injunction is granted, defendants may be irreparably damaged. The revenue thus channeled to Kansas City might otherwise be received by other members firms of NYSE, and strengthen their financial positions, making it easier for them to attract capital.

If the Court were to grant an injunction and permit Stark, Inc. to function as usual, doing business in the regular way during the pendency of this litigation, which might take some months, there would be no way by which that loss to other members could be restored to them. Efforts to obtain a stipulation disposing of this application broke down on this very point because there was no practical way in which Kansas City could be prevented, if defendants are ultimately successful in this litigation, from profiting during the pendency of the lawsuit at the expense of its other members firms of NYSE.

Kansas City, having failed to obtain admission to the NYSE in its own right, tendered to Stark, Inc., an amount of money amounting to its then existing capital, multiplied by 19 times; and fostered this game plan, which has as its purpose and result, a rebate of 95% of the net profits made from Kansas City's directed business. Secure in their viewpoint that they were right about the ultimate invalidity of Rule 318, which can only be determined after full-scale litigation, Stark, Inc. and Kansas City in effect, walked into the controversy knowingly and intending to frustrate the orderly administration of the NYSE and the administration and enforcement of rules which are at least *prima facie* valid. There is some suggestion that they believed that grandfather rights could be acquired by their activities in view of the imminent change in the rules. Persons following such a game plan are not favored in equity; in effect having created a condition of violation intentionally, they now seek the relief of equity from the natural results of their intentional acts.

The public interest is an appropriate element for consideration in connection with the issuance of a preliminary injunction. All facts before me, and the arguments advanced by General Counsel to the SEC lead me to conclude such an injunction granted to Stark, Inc. would adversely affect the market and the public interest.

There is a distinct possibility that plaintiffs' conduct, if aided by a court of equity will, if a preliminary injunction pending trial is issued, lead to a veritable stampede on the part of other exchange members to inaugurate the same capital structure and thereby perhaps obtain grandfather rights.

By reason of the foregoing, the Court concludes that Stark, Inc. is not entitled to any injunctive relief pending trial. However, in order that litigation may proceed in an orderly manner, and to allow Stark, Inc. a meaningful opportunity for appellate review, and also to permit Stark, Inc. to phase out its business activities in the discharge of pending transactions for its customer, the Court hereby restrains temporarily the execution of the expulsion order by the NYSE with respect to Stark, Inc. for a period of five (5) business days following the date hereof.

A different situation exists as to Mr. Stark. He shows a greater likelihood of success in the litigation, in that on a full examination of the record he may well be restored to his individual membership in the NYSE. It appears clear on this record that he acted in all respects in good faith, in reliance on the justice of his cause, and pursuant to the legal advice of eminent counsel skilled in the law. All of his actions complained of were committed in his capacity as an officer or director of Stark, Inc. No moral turpitude is suggested. His acts did not result in personal benefit to any great extent since 95% of Stark, Inc.'s profits go to Kansas City, with the balance available to debt service on his promissory note.

It is a matter of extreme obloquy for an individual person to be expelled as a NYSE member. Expulsion may affect adversely his standing in the community and credit rating and reputation. He shows irreparable damage. Such a severe penalty has not before been visited on a NYSE member in the absence of dishonesty, unfairness, insolvency or moral turpitude or gross negligence. While members subject themselves to jurisdiction of the body, it must exercise such powers fairly. On this score, he shows a reasonable probability of success. Matter of Lamborn v. New York Cotton Exchange, 203 App.Div. 565, 197 N.Y.S. 57; Stein v. Marks, 44 Misc. 140, 89 N.Y.S. 921. We are not cited to any case in which a NYSE member was expelled under these circumstances. His hearing was held jointly with that of Stark, Inc.; he was represented by the same counsel and the penalty visited on him was the same, although his participation was at most indirect, and therefore different from the corporation's. His activities in this matter seem to the Court to be of a peripheral nature. Some of these issues are not adequately pleaded, but could be, and may be litigated here under pendent jurisdiction. After a full trial on the merits, even if the violation of Rule 318 and the consequent expulsion by reason thereof is sustained as to Stark, Inc., it may not be found appropriate or necessary to expel Mr. Stark for the same cause.

The Court will grant a limited preliminary injunction pending the trial of this action, solely with respect to Mr. Stark individually. Such injunction shall prevent defendants, or any of them, pending the trial of this action or the further order of this Court, from placing in effect any order of suspension or expulsion or withdrawal of approval of plaintiff Robert W. Stark, Jr. as a member of the NYSE. The preliminary injunction is conditioned on the filing herein of a bond by Mr. Stark in the amount of $10,000.00 to secure defendants from any loss or damage by reason of the granting of the injunction.

Plaintiff is cautioned that during the effective period of the injunction pending trial he may not directly or indirectly engage in any procedures intended to effectuate a rebate or recapture of commissions to any customer, and that he must comply with all the rules of the NYSE from this date forward.

The foregoing constitutes the findings of fact and conclusions of law of this Court, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## APPENDIX A

### PROPOSED EXCHANGE RULE ON INSTITUTIONAL MEMBERSHIP

(1) Every member or member organization shall have as its principal purpose the conduct of a public securities business. A member shall be deemed to have such a purpose if at least 80% of the value of exchange securities transactions effected by it during the preceding six calendar months, whether as a broker or dealer, is effected for or with persons other than affiliated persons or is effected pursuant to transactions of the kind described below:

(a) any transaction by a registered specialist in a security in which he is so registered;

(b) any transaction for the account of an odd-lot dealer in a security in which he is so registered;

(c) any transaction by a block positioner acting as such, except where an affiliated person is a party to the transaction;

(d) any stabilizing transaction effected in compliance with Rule 10b-7 under the Securities Exchange Act of 1934 to facilitate a distribution of a security in which the member organization effecting such transaction is participating;

(e) any bona fide arbitrage transaction, including hedging between an equity security and a security entitling the holder to acquire such equity security, or any risk arbitrage transaction in connection with a merger, acquisition, tender offer or similar transaction involving a recapitalization;

(f) any transaction effected in conformity with a plan designed to eliminate floor trading activities which are not beneficial to the market, which plan has been adopted by the Exchange and declared effective by the Commission;

(g) any transaction made with the prior approval of a floor official to permit the member effecting such transaction to contribute to the maintenance of a fair and orderly market, or any purchase or sale to reverse any such transaction; or

(h) any transaction to offset a transaction made in error.

(2) For purposes of this rule, an "affiliated person" of a member shall include the account of (i) any partner, officer or director of such member, or any person performing substantially similar functions, and members of their immediate families; (ii) any person directly or indirectly controlling, controlled by or under common control with such member, whether by contractual arrangement or otherwise, provided, the right to exercise investment discretion with respect to an account, without more, shall not constitute control; and (iii) any investment company of which such member, or any person controlling, controlled by or under common control with

such member, is an investment adviser within the meaning of the Investment Company Act of 1940. A person shall be deemed to control another person if such person has a right to participate to the extent of 25% or more in the profits of such other person or owns beneficially, directly or indirectly, 25% or more of the outstanding voting securities of such person.