**KMW INTERNATIONAL, Appellee,**

v.

**CHASE MANHATTAN BANK, N. A., Appellant.**

**No. 1043, Docket 79-7231.**

United States Court of Appeals, Second Circuit.

Argued May 9, 1979.

Decided Aug. 10, 1979.

*Empire Fire and Marine Ins. Co.*, 597 F.2d 798, 808–10 (2d Cir. 1979).

William E. Jackson, Milbank, Tweed, Hadley & McCloy, New York City (Norman R. Nelson, Lana Borsook, Milbank, Tweed, Hadley & McCloy, New York City, of counsel), for appellant.

Benjamin E. Haller, Hill, Betts & Nash, New York City (Lloyd DeVos, Hill, Betts & Nash, New York City, of counsel), for appellee.

Before SMITH, OAKES, and VAN GRAAFEILAND, Circuit Judges.

OAKES, Circuit Judge:

Defendant-appellant, The Chase Manhattan Bank, N. A. (Chase), appeals in this diversity case from the grant of a preliminary injunction on motion of the plaintiff-appellee, KMW International (KMW). The injunction was granted by the United States District Court for the Southern District of New York, Milton Pollack, Judge, by two orders, entered March 12, 1979, and March 29, 1979. It restrains Chase from honoring or making any payment under an irrevocable letter of credit issued by it from KMW's account in favor of Banque Etebarate of Tehran, Iran, on application of the City National Bank of Mobile, Alabama. The injunction also directed Chase to send notice to Banque Etebarate that the operation of the letter of credit had been suspended and would not be honored until further order of the court. Jurisdiction of this court is based on 28 U.S.C. § 1292(a)(1).

KMW is a Netherlands Antilles partnership consisting of three Netherlands Antilles corporations. Its principal business is the sale and export of forestry products from the United States to foreign purchasers. In August, 1978, KMW received a purchase order for telephone poles from the Khuzestan Water and Power Authority (Water and Power Authority). The order was conditioned upon KMW's obtaining a performance guarantee through an Iranian bank for 10% of the total value of the purchase order, or approximately $350,000. KMW accepted the order in September, 1978.

Accordingly, KMW arranged to have its Alabama bank request Chase to issue an irrevocable letter of credit for the benefit of the Water and Power Authority in favor of an Iranian bank. The Iranian bank, in reliance on that letter of credit, was under the purchase order to issue a performance guarantee in favor of the Water and Power Authority. On October 3, 1978, Chase did

issue an irrevocable letter of credit[1] in favor of Banque Etebarate of Tehran, providing for payment to Banque Etebarate upon receipt by Chase of

[Banque Etebarate's] authenticated cable certifying [that] the amount drawn is the amount you have been called upon to pay Khuzestan Water and Power Authority, P. O. Box 13, Ahwaz, Iran, under your guarantee issued at the request of KMW International due to nonperformance by KMW International under the terms of Khuzestan Water and Power Authority purchase order # 4229 dated August 1, 1978 . . . .

Having been issued the letter of credit, Banque Etebarate issued a performance guarantee in favor of the Water and Power Authority on October 29, 1978.

Under the purchase order, the Water and Power Authority was required to pay KMW for the telephone poles by means of a separate letter of credit that would be established by the Water and Power Authority through a prime American bank in favor of KMW. KMW's obligation to ship the telephone poles was deferred until a date within three to ten months after it received the letter of credit in its favor.

After Chase issued its letter of credit, KMW attempted to ascertain whether the Water and Power Authority had arranged for its letter of credit. It was told that the Authority was awaiting confirmation of the performance guarantee issued by Banque Etebarate. Banque Etebarate also told KMW that the performance guarantee had been issued to the Water and Power Authority's office in Tehran but that the Authority's Ahwaz office had not received notification because of the postal strike then in process before the downfall of the Imperial Government. KMW alleges, and we accept as fact, that it never received the letter of credit to be established in its favor. KMW therefore claims it has no obligation to ship any telephone poles under its contract, and we assume this to be the case, as of now.

In January and February, 1979, the Shah left Iran; Dr. Bakhtiar, the head of the Regency Council appointed by the Shah, resigned; the Imperial Government of Iran ceased to exist; and the revolutionary regime opposed to the former Imperial Government was established. The United States on February 16, 1979, announced by a formal declaration, followed by statements by the Department of State's spokesman, Hodding Carter, that it at least informally recognized the government in power in Iran.

On February 28, 1979, KMW obtained a temporary restraining order enjoining Chase from making any payment. The basis of KMW's complaint was a claim that any demand under the letter of credit issued by Chase or under any performance guarantee issued by Banque Etebarate "of necessity would be false and fraudulent," that the contract had been wholly frustrated because of nonperformance of that contract by the Water and Power Authority, and that persons unknown during the civil turmoil in Iran might make fraudulent drawings under the performance guarantee or under the letter of credit.

At a March 9, 1979, hearing on KMW's motion for a preliminary injunction, the court stated that Iran was in a state of chaos and that there was then no recognized government in Iran. It added that the United States had made "only a gesture" toward recognition. The court took judicial notice that a state of insurrection had occurred which created "a suspension, if not a termination, of the status" of the Water and Power Authority. It further found that the Authority had not performed and the court was dubious whether it would or could perform by reason of the civil tumult, insurrection, and overthrow of the government.

Judge Pollack went on to reason that KMW had a right to cancel or suspend the irrevocable letter of credit, evidently on the

1. Under its terms the letter of credit was to expire on September 1, 1979, subject to extension at Banque Etebarate's request for successive 90-day periods; the letter of credit became operative on October 19, 1978.

**14**

basis that supervening illegality, impossibility, war, or insurrection as possible defenses to the underlying obligations of the contract of sale were the equivalents of fraud for purposes of granting an injunction. His order of March 9, given orally at the close of the hearing, preliminarily enjoined honoring the letter of credit and directed Chase to notify Banque Etebarate accordingly, which Chase did.

On March 16, 1979, at the request of Chase an additional hearing was held. The court made certain inquiries of the Department of State as to the status of the Water and Power Authority. The court received copies of the response which the United States Embassy in Tehran had given to the State Department's inquiries on the subject. The Embassy had informed the State Department that it had received a report from the Tehran representative of the Water and Power Authority that there was "no change" in its status, that it was functioning, and that nothing had changed concerning the status of its contractual obligations.

Chase also received a cable, dated March 19, 1979, from Banque Etebarate in response to its notification of suspension, pointing out that the Banque could not accept suspension of the letter of credit, because it was irrevocable and subject to the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 290 (1974 Revision) (the UCP), and that Banque Etebarate was under obligation to pay to the Water and Power Authority the amount of its guarantee due to the suspension of the counter-indemnity. Banque Etebarate also stated that absent confirmation it would "be forced to submit its file to the Iranian Finance Ministry and the Central Bank of Iran." Meanwhile, KMW had been unable to reach the Water and Power Authority by telephone. KMW had telexed both the main office and the Tehran office of the Authority insisting that the performance bond be returned immediately. At the request of KMW the State Department telexed the United States Embassy inquiring about KMW's inability to make contact with the Water and Power Authority. It also inquired about the broader consequences that the issues in this case could have on the conduct of international trade. In response, the Embassy pointed out that because March 20–27 was a holiday period in Tehran, it was not surprising that KMW had found it impossible to reach the Water and Power Authority.

Chase then requested reargument and a vacation of the preliminary injunction which had been orally granted on March 9 and filed on March 12. On March 29, 1979, the court convened a hearing to put assorted communications between the Department of State and the court, between Chase and Banque Etebarate, and from KMW to the Water and Power Authority in the record. The court then denied Chase's request to vacate the injunction, signed an order formalizing the injunction previously granted by endorsement, and fixed the amount of security required as a condition of the preliminary injunction. Chase filed a notice of appeal from the orders on March 30, 1979.

■ The legal standard in the Second Circuit for preliminary injunctive relief clearly calls for a showing of (a) possible irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir. 1979); *Caulfield v. Board of Education,* 583 F.2d 605, 610 (2d Cir. 1978). We agree with Chase that these prerequisites have not been established by KMW.

■ In the first place, KMW has not shown that it will suffer possible irreparable injury absent the injunction. KMW claims a possible loss of $347,539.55. This circuit does not recognize as irreparable harm a loss that may be adequately redressed by a monetary award. *Jackson Dairy, supra; Hudson Tire Mart, Inc. v. Aetna Casualty & Surety Co.,* 518 F.2d 671, 675 (2d Cir. 1975); *Robert W. Stark Jr., Inc.*

*v. New York Stock Exchange, Inc.,* 346 F.Supp. 217, 231 (S.D.N.Y.), *aff'd,* 466 F.2d 743, 744 (2d Cir. 1972); *Shelley v. The Maccabees,* 183 F.Supp. 681, 684 (E.D.N.Y.1960). Appellant claims, however, that the financial damage which it may suffer is irreparable, since it will have no real remedy, at least by way of resort to Iranian courts, if Chase were to pay a demand which appears to comply with the terms of credit but is in fact fraudulent. But this damage is purely conjectural. At the time the preliminary injunction was granted, Chase had received no demand for payment whatsoever; that a later demand would necessarily be fraudulent is at best speculative. "[I]njunctive relief can and should be predicated only on the basis of a showing that the alleged threats of irreparable harm are not remote or speculative but are actual and imminent." *State of New York v. Nuclear Regulatory Commission,* 550 F.2d 745, 755 (2d Cir. 1977). Since KMW's damages are financial in nature or, at best, of a speculative quality, a preliminary injunction should not have issued.

■ Furthermore, when KMW entered into its contract with the Water and Power Authority it assumed the business risks of international transactions. These risks included the possibility that even if a dispute about performance of the underlying contract should arise and international litigation ensue, which we assume can occur in this case, KMW's funds would be paid out under the irrevocable letter of credit and held in foreign hands. A preliminary injunction shifts the burden to Chase to pursue that international litigation. Such a shifting of risk is unwarranted where, as here, one party to an international business transaction has previously subjected itself to the risks and hazards of foreign political turmoil. *See United Technologies Corp. v. Citibank, N.A.,* 469 F.Supp. 473 (S.D.N.Y. 1979) (Gagliardi, J.); *Outlander Man v.Citibank, N.A.,* No. 22789–76 (N.Y.Sup.Ct. 1st Dep't, Apr. 25, 1977) (Kirschenbaum, J.); *Grob v. Manufacturers Trust Co.,* 177 Misc. 45, 46, 29 N.Y.S.2d 916, 916 (Sup.Ct.1941).[2]

Additionally, there has been no showing either of probable success on the merits or of sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward KMW. One or the other of those showings is necessary for preliminary injunctive relief. *Caulfield v. Board of Education, supra,* 583 F.2d at 610.

■ As a matter of law, a bank's obligation under a letter of credit is totally independent of the underlying transaction. UCP General Provisions and Definitions Paragraph c and Article 8(a) provide:

c. Credits, by their nature, are separate transactions from the sales or other contracts on which they may be based and banks are in no way concerned with or bound by such contracts.

8(a). In documentary credit operations all parties concerned deal in documents and not in goods.

By virtue of the letter of Credit, Chase is subject to the UCP.[3] *See also Chase Manhattan Bank, N. A. v. Equibank,* 550 F.2d 882, 885 (3d Cir. 1977); *Venizelos, S. A. v. Chase Manhattan Bank,* 425 F.2d 461, 465

---

**2.** Moreover, the preliminary injunction would impose business hardships on Chase. We take judicial notice that Chase and its affiliates conduct business in Iran and other foreign countries. An irrevocable letter of credit is an unconditional obligation to pay upon proper demand. (*See infra* p. 17.) The preliminary injunction hinders Chase's ability to honor commitments it must meet in the international banking community.

**3.** By the terms of the cable-confirming letter of credit (Oct. 3, 1978), Chase is subject to the UCP. KMW urges that §§ 5–114(1) and (2) of the Uniform Commercial Code, as adopted by New York require affirmance. However, Article 5 of the N.Y. U.C.C. is inapplicable to the letter of credit because N.Y. U.C.C. § 5–102(4) states that Article 5 is inapplicable to letters of credit which are subject to the UCP by the "terms [of the letter of credit] or by agreement, course of dealing or usage of trade . . . ." This does not, however, take away from the point that apparent "fraud in the transaction" or fraudulent documentation may be a defense under either the U.C.C. or the UCP. *United Bank Ltd. v. Cambridge Sporting Goods Corp.,* 41 N.Y.2d 254, 258 n.2, 392 N.Y.S.2d 265, 269 n.2, 360 N.E.2d 943, 947 n.2 (1976).

(2d Cir. 1970). As a leading commentator has pointed out, "The financial value of the letter of credit promise is predicated upon its degree of legal certainty." B. Kozolchyk, *Commercial Letters of Credit in the Americas* § 18.04[1], at 394–95 (1966). The issuing bank's obligation under an international irrevocable letter of credit may not be modified without the consent of both the customer and the beneficiary. UCP Article 3(c).[4] *See also* N.Y. U.C.C. § 5–106(2). There is nothing in the U.C.C. or the UCP which excuses an issuing bank from paying a letter of credit because of supervening illegality, impossibility, war or insurrection. Indeed, Article 8(c) of the UCP provides the opposite, *viz.*, that a bank suspecting noncongruence with terms and conditions of credit "must determine, on the basis of the documents alone, whether to claim that payment, acceptance or negotiation was not effected in accordance with the terms and conditions of the credit."

 There is, as we have suggested, note 3 *supra*, limited authority for enjoining payment under a letter of credit when the documentation presented is fraudulent or there is "fraud in the transaction." *United Bank, Ltd. v. Cambridge Sporting Goods Corp.*, 41 N.Y.2d 254, 392 N.Y.S.2d 265, 360 N.E.2d 943 (1976) (fraudulent shipment of goods); *Merchants Corp. v. Chase Manhattan Bank, N. A.*, 5 UCC Rep.Serv. 196 (N.Y. Sup.Ct.1968); *Sztejn v. J. Henry Schroder Banking Corp.*, 177 Misc. 719, 31 N.Y.S.2d 631 (Sup.Ct.1941) (Shientag, J.) (fraudulent nonshipment of goods). This authority has recently been construed in the New York courts as to permit injunctive relief only in case of a "clear showing of the active intentional fraud complained of," not merely anticipated fraud as claimed here. *American Bell International, Inc. v. Manufacturers Hanover Trust Co.*, No. 3157/79 (Sup.Ct. N.Y. Mar. 26, 1979), *aff'd* (App.Div. 1st Dep't), N.Y.L.J., June 28, 1979, p. 6, col. 1 (refusing to enjoin payment of a letter of credit in favor of Iranian government entities). *See also Harris Corp. v. Bank Melli Iran*, 79C560 (N.D.Ill. Mar. 22, 1979). There is no question that prior to suit Chase had received no demand for payment whatsoever, so that the injunction cannot as a matter of law be upheld on the grounds stated in N.Y. U.C.C. § 5–114 that "a required document . . . is forged or fraudulent . . . ." Nor is there any basis here for finding "fraud in the transaction" unless that phrase is given some meaning we have been unable to divine from the New York cases. *Balfour, Maclaine International Ltd. v. Manufacturers Hanover Trust Co.*, No. 20801/78 (Sup.Ct.N.Y. Jan. 19, 1979); *see also United Technologies Corp. v. Citibank, N. A.*, *supra*. In light of the foregoing cases we agree with Judge Gagliardi in *United Technologies Corp.* that *Nadler v. Mei Loong Corp.*, 177 Misc. 263, 30 N.Y.S.2d 323 (Sup.Ct.1941) (documents facially proper though claimed to be fraudulent; wartime plus Japanese and United States embargoes on shipment from China permit injunction), does not govern this case. *See* Comment, 55 Harv.L.Rev. 878, 880–81 (1942). Insurrection or supervening impossibility are not equivalents of fraud. *American Steel Co. v. Irving National Bank*, 266 F. 41 (2d Cir. 1920), *cert. denied*, 258 U.S. 617, 42 S.Ct. 271, 66 L.Ed. 793 (1922) (impossibility); *Frey & Son v. E. R. Sherburne Co.*, 193 App.Div. 849, 851, 184 N.Y.S. 661, 662 (1920) (injunction against payment of letter of credit denied; accidents and other defenses to underlying contract immaterial). The "unsettled situation in Iran" is simply insufficient to release any party from obligations under the letter of credit which are separate from the underlying contract.

 Although there has been a change of government in Iran, the United States has so far as appears recognized the present government as the de jure govern-

---

4. Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 290 (1974 Revision) (UCP) Article 3(c) provides:

> Such undertakings can neither be amended nor cancelled without the agreement of all parties thereto. Partial acceptance of amendments is not effective without the agreement of all parties thereto.

ment. The present Iranian government is therefore entitled by operation of law to enforce the rights of the Water and Power Authority, an agency of a province of Iran, under the performance guarantee secured by the letter of credit.[5]

██ Even if the foregoing demonstrated a fair ground for litigation, the balance of hardships would not tip decidedly in favor of KMW, which as we have said assumed the risk of doing business in Iran in the first instance.

Both in the international business community and in Iran itself, Chase's commercial honor is essentially at stake. Failure to perform on its irrevocable letter of credit would constitute a breach of trust and substantially injure its reputation and perhaps even American credibility in foreign communities. Moreover, it could subject Chase to litigation in connection with not only this matter but also other banking affairs in Iran.

We take judicial notice of the fact that the Iranian banks have been nationalized since the argument on this appeal. However, we do not see that this changes our views on this controversy.

██ Although we conclude that the preliminary injunction must be vacated because KMW has failed to satisfy the *Caulfield v. Board of Education* test, we are not disabled from extending a more limited form of relief. Pursuant to our general equitable powers and in the interest of justice, *see* 28 U.S.C. § 2106, we direct Chase to provide KMW with three days' notice in writing of receipt of a demand for payment before making payment thereon. This three-day notice corresponds to the three-day period which N.Y. U.C.C. § 5–112 allows issuing banks to decide whether to honor or dishonor demands upon letters of credit. In view of the circumstances currently existing in Iran, we consider that anything less than three days would not be in compliance with the spirit if not the letter of Article 8d of the UCP which requires that "[t]he issuing bank shall have a reasonable time to examine the documents and to determine . . . whether to make such a claim [that payment, acceptance or negotiation was not effected in accordance with the terms and conditions of the credit]." *Cf. Harris International Telecommunications, Inc. v. Bank Melli Iran*, 79 Civ. 802 (S.D.N.Y. Feb. 22, 1979) (court granted preliminary injunction requiring a ten-day notice of any demand for payment). Such notice permits KMW either to provide evidence of fraud or to take such other action as KMW deems appropriate. Chase indicated on argument that it would have no objection to such a direction.

Judgment in accordance with opinion; costs to appellant.

5. Recognition may occur by a manifestation of intent, by a public declaration of an authorized official. Presumably this would include a spokesperson for the Department of State. Restatement (Second) of Foreign Relations Law of the United States § 104(1) (1965). Recognition is a matter as to which the courts are bound by the Executive Branch's determination, *Guaranty Trust Co. v. United States*, 304 U.S. 126, 137–38, 58 S.Ct. 785, 82 L.Ed. 1224 (1938), and of which the court may take judicial notice, *United States v. Belmont*, 301 U.S. 324, 330, 57 S.Ct. 758, 81 L.Ed. 1134 (1937). KMW appears to concede that de jure recognition of the Bazargan regime has taken place, although that has evidently not ended the upheaval in Iran.