**HARRIS CORPORATION,**
Plaintiff-Appellee,

v.

**NATIONAL IRANIAN RADIO AND TELEVISION and Bank Melli Iran,**
Defendants-Appellants.

No. 80–5731.

United States Court of Appeals,
Eleventh Circuit.

Nov. 22, 1982.

Kramer, Levin, Nessen, Kamin & Soll, Daniel P. Levitt, Greg A. Danilow, New York City, for Bank Melli Iran.

Abourezk, Shack & Mendenhall, Thomas G. Shack, Jr., Christine Nettesheim, Washington, D.C., Jeffrey S. Goldman, Ernest J. Rice, Orlando, Fla., for National Iranian Radio and Television.

Donovan, Leisure, Newton & Irvine, Louis C. Lustenberger, Robert Garcia, Howard R. Reiss, Charles W. Gerdts, III, New York City, Reinman, Harrell, Silberhorn,

Moule & Boyd, Edward J. Silberhorn, Melbourne, Fla., for plaintiff-appellee.

Robert E. Kopp, Michael F. Hertz, Civ. Div., Dept. of Justice, Washington, D.C., amicus.

Before HILL and KRAVITCH, Circuit Judges, and MORGAN, Senior Circuit Judge.

JAMES C. HILL, Circuit Judge:

National Iranian Radio and Television ("NIRT") and Bank Melli Iran appeal from a district court order granting plaintiff-appellee Harris Corporation preliminary injunctive relief. The court enjoined: (1) NIRT from making a demand on Bank Melli under a certain bank guaranty letter of credit; (2) Bank Melli from making payment to NIRT under that letter of credit; and (3) Bank Melli from receiving payment from Continental Illinois National Bank and Trust Company ("Continental Bank") under a standby letter of credit issued by Continental Bank in favor of Bank Melli.[1] The appellants challenge the jurisdiction of the district court, assert a lack of proper venue, and argue that the court abused its discretion by ordering preliminary relief. After careful consideration of the issues presented, we affirm.

## I. THE FACTS

On February 22, 1978, the Broadcast Products Division of Harris Corporation entered into a contract with NIRT ("the contract") to manufacture and deliver 144 FM broadcast transmitters to Teheran, Iran, and to provide related training and technical services for a total price of $6,740,352. Harris received an advance payment of $1,331,470.40, which was to be amortized over the life of the contract by deducting a percentage of the payment due upon shipment of the equipment or receipt of the services and training from the balance of the advance.[2]

Pursuant to the contract, Harris obtained a performance guarantee in favor of NIRT from Bank Melli, an agency of the State of Iran.[3] The guarantee provides that Melli is to pay NIRT any amount up to $674,035.20 upon Melli's receipt of NIRT's written declaration that Harris has failed to comply with the terms and conditions of the con-

---

1. The preliminary injunction also (a) directs Harris to maintain a blocked account in the amount of the letter of credit, $674,035.20, in accordance with the Iranian Assets Control Regulations, 31 C.F.R. § 535.568 (1980), (b) enjoins distribution or removal of any funds from the blocked account, (c) directs the attachment of the blocked account for Harris's benefit, and (d) continues a bond requirement of $674,-035.20. Appellants do not challenge these provisions.

2. Upon shipment of the equipment and receipt of the training, NIRT paid 80% of the price and deducted the remaining 20% from the advance payment. As to services, NIRT paid 90% of the invoice price and deducted 10% from the advance.

For NIRT's protection in case the contract terminated prior to full performance, the contract required that Harris obtain a guarantee letter of credit which would provide that advance payment not yet liquidated would be returned to NIRT. The central bank of Iran, Bank Markazi, issued the guarantee in the

amount of $1,331,470.40; Harris's performance has amortized all but $69,559 of the advance payment and the guarantee has been reduced accordingly. That guarantee letter of credit is not involved here.

Harris does not seek damages in this action, but it contends that NIRT owes $128,410 for training which was completed in February, 1979. Also, NIRT has not paid for certain transmitters which have been completed but not shipped.

3. The agreement is a standby letter of credit; it will be referred to herein as a performance guarantee or a guarantee letter of credit in order more easily to distinguish it from the standby letter of credit issued by Continental Bank in favor of Bank Melli. For an explanation of the operation of standby letters of credit and a comparison of standbys with traditional, commercial letters of credit, see Comment, *Enjoining the International Standby Letter of Credit: The Iranian Letter of Credit Cases*, 21 Harv. Int'l L.J. 189, 190-200 (1980).

tract. The contract between Harris and NIRT makes the guarantee an integral part of the contract [4] and provides that NIRT must release the guarantee upon termination of the contract due to force majeure.[5] Before Melli issued the guarantee it required that Harris obtain a letter of credit in Melli's favor. Continental Bank issued this standby, which provides that Continental is to reimburse Melli to the extent that Melli pays on the guarantee it issued. Harris, in turn, must indemnify Continental Bank to the extent that Continental pays Melli.

From August 1978 through February 1979, Harris shipped to Iran 138 of the 144 transmitters (together with related equipment for 144 transmitters) and also conducted a 24-week training program in the United States for NIRT personnel. In February 1979, the Islamic Republic of Iran overthrew the Imperial Government of Iran. After the overthrow, one shipment of goods which Harris sent could not be delivered safely in Iran. Harris notified NIRT, by telex dated February 27, that those goods were taken to Antwerp, Belgium, and Sharjah, United Arab Empirates.

Frank R. Blaha, the Director of Customer Products and Systems Operations of the Broadcast Products Division of Harris Corporation, met with NIRT officials in Teheran in early May, 1979, to help them obtain the goods in Antwerp, to discuss amendments to the contract, and to discuss a revised delivery schedule made necessary by Iranian events. Harris, offering Blaha's affidavit, contends that all parties at those

---

**4.** "The term 'contract documents' shall mean the following documents, which shall be deemed as an integral part of this contract: ... [6] the bank guarantees ...." Contract ¶ 3.

**5.** The following paragraphs in the contract deal with force majeure and termination of the contract:

11–5 The contractor shall not be liable for any excess cost or for liquidated damage for delay if any failure to perform the contract arises out of force majeure acts of nature, or of government, fires, floods, epidemics, quarantins [sic] restrictions, to [sic] any such causes unless NIRT shall determine that the materials or equipment or services to be furnished by the contractor were obtainable from other source [sic] in sufficient time to permit the contractor to meet the required time schedule, provided that the contractor shall within (10) ten days from the beginning of such delay, notify NIRT in writing of the causes of the delay.

NIRT shall ascertain the facts and the extent of the delay and extend the time for completing the work as its judgment and finding justify. In any event the contractor shall make every effort to overcome the causes of delay and to arrange substitute procedure and shall continue to perform his obligations to the extent he can.

11–6 If, arriving at any cause as set forth in paragraph 11–5 above, the contractor finds it impractical to continue operations, or if owing to force majeure or to any cause beyond NIRT's control, NIRT finds it impossible to continue operations, then prompt notification, in writing, shall be given by the party affected to the other.

If the difficulties or delay caused by force majeure cannot be expected to ease or become available, or if operations cannot be resumed within (6) six months, then either party shall have the right to terminate the contract upon (10) ten days written notice to the other. In the event of termination of the contract under this paragraph, payment will be made to the contractor as follows:

(a) The contractor will be paid for all work completed as shown by the progress reports and for all reimbursable expenses due and unpaid. "Reimbursable expenses" means all expenses for service, material, equipment completed at the date of notification to terminate the contract and payment of which is pending under normal contractual terms. However, NIRT undertakes to pay for contractual equipment which was delivered, shipped, or ready for shipment, or within the production time, only according to the contract unit prices.

(b) The contractor will also be paid for any work done during the said (6) six months period as well as for settlement of any financial commitments made in connection with the proper performance of the contract and not reasonably defrayed by payments under (a) above.

(c) NIRT will also release all bonds and guarantee unless the total amount of payment previously paid to the contractor exceeds the final amount due to him, in which case, the contractor shall refund the excess within (60) days after termination, against the release of bonds and guarantee furnished to NIRT.

meetings acknowledged the existence of force majeure as defined in the contract provisions set forth in note 5 *supra.*

Blaha worked in May to obtain the Antwerp goods for NIRT, then returned to Teheran to continue discussions with NIRT officials. At these discussions, NIRT agreed to delay shipment of the final six transmitters until the fall of 1979 due to the conditions in Iran.

Negotiations on contract modifications continued during the summer and fall of 1979. On August 18, 1979, Harris formally advised NIRT of the additional costs it had incurred with respect to the goods that had been reshipped from Antwerp, and Harris requested payment for the additional amount in accordance with the contract's force majeure clause and with a letter from NIRT authorizing Harris to reship the goods.

On November 4, 1979, Iranian militants took 52 hostages at the United States Embassy in Teheran. Harris received no further communications from NIRT after the seizure of the hostages.

Harris completed the remaining six transmitters in November 1979 and inventoried them for future delivery. Harris, supported by Blaha's affidavits, has argued that disruptive conditions created by the Iranian revolution initially prevented ship-

ment of the final six transmitters. Subsequently, Harris contends, it was unable to ship the materials as a result of the Iranian Assets Control Regulations effective November 14, 1979.[6] In particular, Harris points out, the Treasury voided all general licenses to ship to Iran and required sellers to obtain special license on a case-by-case basis before exporting goods. *See* 31 C.F.R. § 535.533 (1979). An affidavit submitted by Blaha states that Harris's counsel was advised by the Office of Foreign Assets Control that special licenses would be issued only in emergency situations or for humanitarian reasons and would not be issued for the transmitters. This request is not documented, and Harris did not inform NIRT of its inability to ship. On April 7, 1980, Treasury Regulation 535.207 became effective and prohibited the shipment of nonessential items to Iran. 45 Reg. 24,434 (1980).

On June 3, 1980, Continental Bank received a telex from Melli reporting that NIRT had presented Melli with a written declaration that Harris had failed to comply with the terms of the contract[7] and stating that NIRT had demanded that Melli extend or pay the guarantee. Melli demanded that it be authorized to extend the guarantee and that Continental Bank extend its corresponding letter of credit to Melli, or else Melli would pay the guarantee and demand immediate payment from Continental.[8]

---

**6.** President Carter declared a national emergency on November 14, 1979, and blocked the removal or transfer of Iranian assets. Exec. Order No. 12,170, 3 C.F.R. 457 (1980). To implement the blocking order, the Treasury Department promulgated the Iranian Assets Control Regulations, 31 C.F.R. §§ 535.101–904 (1981).

**7.** The contract allowed NIRT to terminate the whole or any part of the contract, by written notice of default to Harris, under the following circumstances:
  (a) If in the judgment of NIRT the contractor fails to make delivery of material and equipment or to perform installations supervisory work or services within the time specified herein or any extension thereof.
  (b) If in the judgment of NIRT the contractor fails to perform any of the other provi-

sions of this contract, or so fails to make progress as to endanger performance of the contract or completion of the work within the time specified herein or any extension thereof, and does not remedy such failure within a period of (30) thirty days (or such longer period as NIRT may authorize in writing) after receipt of notice from NIRT specifying such failure. Harris never received notice from NIRT under this provision of the contract.

**8.** Harris states that Melli had already made four improper demands to extend or pay the guarantee in early 1979. Continental Bank advised Harris that the demands were nonconforming, and NIRT officials told Blaha that they were unaware of Melli's demands. Melli abandoned the prior demands.

In response to the demand by Melli, Harris sought and obtained the preliminary injunction at issue in this case. On July 11, 1980, Harris filed a verified complaint against NIRT and Melli in the United States District Court for the Middle District of Florida, seeking to enjoin payment and receipt of payment on the guarantee and receipt of payment on the letter of credit. The complaint also sought a declaratory judgment that the contract underlying the guarantee and the letter of credit had been terminated by force majeure. The court granted a temporary restraining order on June 13, 1980, pending a hearing on Harris's motion for a preliminary injunction.[9]

. On June 16, 1980, a copy of the TRO was mailed to Melli's counsel and on the following day was hand-delivered to Melli's branch office in Manhattan. On June 20, 1980, three days after receipt of the June 13th TRO at its Manhattan branch office, and despite the restraint against payment contained in the TRO, Melli telexed Continental Bank that it had paid the full amount of the guarantee "after receipt of a demand for payment from the National Iranian Radio and Television stating that there has been a default by Harris Corporation, Broadcast Products Division[,] to comply with the terms and conditions of contract F–601–1 ...." Appendix of Appellee at 421 (Exhibit D of Reply Affidavit of Louis C. Lustenberger, Jr.). The telex also demanded that Continental pay Melli by crediting Melli's London office with the amount of the letter of credit. After a hearing on August 15, 1980, the district court issued the preliminary injunction at issue here.[10]

## II. VENUE

The parties agree that 28 U.S.C. § 1391(f) controls the question of venue since Harris seeks to invoke jurisdiction un-der the Foreign Sovereign Immunities Act of 1976 ("FSIA" or "Act"). Both appellants urge that the district court erred in granting the preliminary injunction because venue was improper under the tests set forth in § 1391(f).

We need not decide, however, whether venue is proper here. As Harris points out, venue is a personal privilege to be raised by motion and the privilege may be waived. See 15 C. Wright and A. Miller, Federal Practice and Procedure § 3846 (1976). Venue is not a jurisdictional prerequisite and its presence or absence does not affect a court's authority to adjudicate. See *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 167–68, 60 S.Ct. 153, 154, 84 L.Ed. 167 (1939). Since the propriety of venue was never questioned before the district court, the appellants have waived any right to raise the issue on appeal. See Fed.R.Civ.P. 12(h); *Keene v. International Union of Operating Engineers Local 624*, 569 F.2d 1375, 1378 (5th Cir. 1978); *Kentucky Fried Chicken v. Diversified Packing Corp.*, 549 F.2d 368, 392 (5th Cir. 1977).

## III. JURISDICTION

Both appellants raise jurisdictional objections to the district court's entry of a preliminary injunction. Melli claims that it has sovereign immunity, which would deprive the court of personal and subject matter jurisdiction. NIRT contends that service of process was improper and that personal jurisdiction was lacking. These issues involve the FSIA.

### A. Subject Matter Jurisdiction

#### 1. The Statutory Requirement:

#### An Exception to Sovereign Immunity

The asserted basis for jurisdiction here is FSIA § 1330(a), which permits a district court to exercise:

---

9. Following entry of the TRO, Harris advised Continental Bank that payment on the letter of credit would aid and abet violation of the restraint imposed on Melli. Continental Bank responded that Harris's creation of a blocked account "discharged" Continental's obligation under the letter of credit and that Continental had so advised Melli.

10. *See* p. 1346 & n. 1 *supra.*

original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in § 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under §§ 1605–1607 of this title or under any applicable international agreement.

If Melli is entitled to sovereign immunity, then § 1330(a) does not confer subject matter jurisdiction. Harris contends, however, that exceptions to judicial immunity are invoked by statute and by international agreement, both of the means refered to in § 1330(a).[11]

■ The international agreement which Harris points to is the Treaty of Amity, Economic Relations, and Consular Rights Between the United States and Iran, 8 U.S.T. 899, T.I.A.S. 3853 (the "Treaty"). Article XI, ¶ 4 of the Treaty provides:

> No enterprise of either high contracting party, including corporations, associations, and government agencies and instrumentalities, which is publicly owned or controlled shall, if it engages in commercial, industrial, shipping or other business activities, within the territories of the other high contracting party, claim or enjoy either for itself or for its property, immunity therein from taxation, suit, execution or judgment or other liability in which privately owned and controlled enterprises are subject therein.

Melli asserts that the scope of the waiver clause in the Treaty is restrictive and that it must read as a territorial, transactional waiver which requires a nexus between the

United States and the particular commercial activity sued upon. It argues that in passing the FSIA, legislators did not intend to create an international court of claims and that the reading it urges is necessary to prevent such a result. We disagree.

First, we note that FSIA does not purport to limit the extent of waiver of sovereign immunity through the effect of a treaty. See 28 U.S.C. § 1604. More specifically, §§ 1605–1607 enumerates transactional contacts which must exist in order for a court to exercise personal jurisdiction based on the waiver of sovereign immunity effected by those sections, but those contact requirements do not impose a barrier on the exercise of jurisdiction based on the waiver of sovereign immunity by treaty. This is confirmed by the legislative history, which states: "Significantly, each of the immunity provisions in the bill, §§ 1605–1607, requires some connection between the law suit and the United States, *or* an expressed or implied waiver by the foreign state of its immunity from jurisdiction." H.R. Rep. 1487, 94th Cong., 2d Sess. 13 ("House Report") *reprinted in* [1976] U.S. Code Cong. & Ad. News 6604, 6612 (emphasis added).

Second, by its terms, the treaty itself does not suggest the limitation urged by Melli. It does require "commercial, industrial, shipping, or other business activities within the [United States]" in order for the controlled enterprise to be subject to the jurisdiction of the courts. However, that requirement—which is clearly met here [12] is not transactional, but is merely a "doing business" type of test.[13]

■ Finally, the reading urged by Melli is not required to prevent plaintiffs from

---

**11.** As indicated, § 1330(a) refers to exceptions to immunity under §§ 1605–1607 and under any applicable international agreement. To some extent, these two sources overlap. Section 1605(a)(1) of the FSIA deals with explicit and implied waivers of foreign immunity by sovereign states, and the House Report accompanying the FSIA contemplates that treaties can constitute explicit waivers: "With respect to explicit waivers, a foreign state may announce its immunity by treaty, as has been done by the United States with respect to commercial and other activities in a series of trea-

ties of friendship, commerce, and navigation . . . ." H.R. Rep. No. 1487, 94th Cong., 2d Sess. 18, *reprinted in* [1976] U.S.Code Cong. and Ad.News 6604, 6617.

**12.** *See* pp. 1352–1353 *infra*.

**13.** The requirement of commercial activity, as opposed to governmental acts, reflects the restrictive theory of sovereign immunity on which the FSIA is based. *See* House Report at 14, [1976] U.S.Code Cong. and Ad.News at 6613.

trying to use § 1330(a) to transform United States courts into international courts of claims. This preventive aim is, of course, proper, but it is accomplished by further restrictions imposed by the requirements for personal jurisdiction, which are set forth in § 1330(b), and—more directly—by constitutional constraints on subject matter jurisdiction and personal jurisdiction. To distort the provision for waiver of sovereign immunity by treaty in order to achieve that aim would unwisely mix conceptually distinct areas of analysis. The resolution of the sovereign immunity question should only involve determining whether the activities engaged in by the enterprise of a foreign state in the United States are the type that should subject it to litigation in domestic courts.

■ Alternatively, as Harris contends, the FSIA itself provides an exception to sovereign immunity here. Section 1605(a)(2) provides that a foreign state shall not be immune in any case in which the action is based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act caused a direct effect in the United States." This case falls within those parameters.

The appellants have clearly been involved in commercial activity[14] in Iran; the issue that Melli contests is whether there has been an act having a "direct effect" in this country. Harris asserts that the appellants' demands for payment on the letters of credit have involved the requisite effect because they "trigger the entry of a blocked account on Harris's books in Melbourne [, Florida,] and discharged the letter of credit." Appellee's Brief at 31. Melli responds by arguing that such an effect is insufficient since the "direct effect" contemplated by the FSIA "is one which has no intervening element, but, rather, flows in a straight line without

deviation or interruption." *Upton v. Empire of Iran,* 459 F.Supp. 264, 266 (D.D.C. 1978), *aff'd mem.* 607 F.2d 494 (D.C.Cir. 1979) (no "direct effect" in United States caused by injuries suffered by United States citizens in Teheran airport although injury was "endured here"). Moreover, Melli contends, the direct effect standard requires a substantial impact in the United States that occurs as a directly foreseeable result of conduct outside the country. *See Harris v. VAO Intourist,* 481 F.Supp. 1056, 1062 (E.D.N.Y.1979) (death of American citizen in fire in Moscow hotel did not cause direct effect in United States).

Essentially, the question presented is, "was the effect sufficiently 'direct' and sufficiently 'in the United States' that Congress would have wanted an American court to hear the case?" *Texas Trading and Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 313 (2d Cir. 1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). The answer is yes. The letter of credit arrangement—which was structured according to the wishes of the appellants—extends into this country, and the appellants' demands thus have significant, foreseeable financial consequences here. This sufficiently establishes a "direct effect" within the meaning of § 1605(a)(2). *Cf. Texas Trading* at 312 (breach of cement contracts or breach of letters of credit would have direct effect in this country because the American corporations would be precluded from collecting money here; "the relevant inquiry ... when plaintiff is a corporation is whether the corporation has suffered a 'direct' financial loss"); *Carey v. National Oil Corp.,* 592 F.2d 673, 676–77 (2d Cir. 1979) (*per curiam*) (suggesting that cancellation of contracts for the sale of oil involves direct effect where corporate buyer is located). Sovereign immunity is thus waived by the applicable statutory provision as well as by treaty.

---

14. "A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). For an analysis of "commercial ac-

tivity," *see Texas Trading and Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 307 10 (2d Cir. 1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).

### 2. The Constitutional Limitation: Article III

The Constitution provides for diversity jurisdiction "between a state, or the citizens thereof, and foreign states." U.S.Const. art. III, § 2, cl. 1. Since this case falls within that grant of jurisdiction, the district court had the power to hear it.

### B. Personal Jurisdiction

Section 1330(b) provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title." Having found subject matter jurisdiction, we must complete the § 1330(b) inquiry by evaluating service of process. Also, since "the Act cannot create personal jurisdiction where the Constitution forbids it," *Texas Trading,* 647 F.2d at 308, we must assess the exercise of authority against the standards of due process.

### 1. Service of Process

Melli, which was served under § 1608(b)(2), does not dispute service.

However, basing its objections on the technical requirements of § 1608, NIRT cites deficiencies in each of the methods of service of process used by Harris.[15]

■ NIRT does not deny that it had notice of this action. The attacks made by NIRT go only to asserted noncompliance with certain FSIA requirements that exist merely to assure that actual notice be received. Under the circumstances, we hold that service was sufficient. The failure to follow precisely those steps in § 1608 designed to insure that actual service be made should not override and invalidate the fact that in this case notice was actually received.[16]

### 2. The Constitutional Constraint: Due Process

To determine whether maintenance of this suit in United States courts is consistent with due process, we must apply the "minimum contacts" standard established by *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).[17] *See Texas Trading,* 647 F.2d at

**15.** Those methods were: (1) transmitting by telex to NIRT on June 12, 1980, the summons, notice of suit, and notice that pleadings would be sent by registered mail in English and Farsi transliteration (in accordance with the substitute service order in *New England Merchants Nat'l Bank v. Iran Power Generation & Transmission Co.,* 495 F.Supp. 73 (S.D.N.Y. 1980)); (2) sending the summons, complaint and notice of suit in English and Farsi by registered mail to NIRT in Iran and to the Office of Consular Service for transmittal through diplomatic channels; and (3) delivering copies of the pleadings and preliminary injunction papers to Abourezk, Shack & Mendenhall, P.C., the firm which was coordinating Iranian litigation on behalf of Iran. (The Abourezk firm appeared at the preliminary hearing and represents NIRT in this appeal.)

**16.** Though we find service adequate here, we admonish those seeking to invoke the FSIA to follow the service provisions it contains. Congress has carefully established a flexible framework so that American plaintiffs will have a variety of acceptable methods of service, even when relations with the foreign country in question are strained; at the same time, the

framework is designed to insure that foreign defendants will get notice. There is no excuse for departure from the dictates of the statute. Here, the record shows that Harris requested approval of a method of service under § 1608(b)(3)(C) at one time, but it apparently did not pursue that request. Similarly, Harris should have complied more closely with § 1608(b)(3)(B), by getting the clerk of the court to dispatch the registered mail. While this step would not have eliminated the problem of obtaining signed receipts for the mail, it would be better than having only an affidavit stating that the mail was sent.

**17.** Observing that § 1605 requires a connection between the lawsuit and the United States, the appellants assert that Congress, by adopting a special jurisdictional statute, "has authorized the exercise of less than the complete personal jurisdiction that might constitutionally be afforded American courts under traditional concepts of fairness and due process." *Harris v. VAO Intourist,* 481 F.Supp. 1056 (1979). However, the appellants' argument is of no avail at this point, for we have found jurisdiction through § 1605(a)(2). *See* p. 1351 *supra.*

If the appellants' argument is correct, it may be that an inquiry into traditional due process

314. If sufficient "affiliating circumstances" exist, the defendants should have reasonably anticipated being subject to suit here, and notions of fairness are satisfied. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291–99, 100 S.Ct. 559, 563–568, 62 L.Ed.2d 490 (1980).

Clearly, Melli has "purposefully avail[ed] itself of the privilege of conducting activities" in the United States, *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958), and thus "has clear notice that it is subject to suit" here, *World-Wide Volkswagen Corp.,* 444 U.S. at 297, 100 S.Ct. at 567. Since 1969, Melli has maintained an active office in New York City. Indeed, in its filings with the Superintendent of Banking of the State of New York, Melli has emphasized the commercial significance of its United States office. Moreover, the business transaction in which Melli is involved in this case requires substantial performance in this country.

NIRT entered into a contract requiring performance by Harris in the United States and involving the training of NIRT personnel here as well. Harris asserts that such business conduct constitutes a contact sufficient to sustain the exercise of personal jurisdiction. It is not necessary for us to resolve that question, however, for NIRT did not raise the issue of lack of personal jurisdiction in the district court.

▮ Generally, an appellate court will not consider issues not raised in the district court, *e.g., United States v. 34.60 Acres of Land,* 642 F.2d 788, 790 (5th Cir.), *cert.*

denied *sub nom., Van Cleve v. United States,* 454 U.S. 107, 102 S.Ct. 125, 70 L.Ed.2d 107 (1981), and we decline to make exception here. Lack of jurisdiction over the person, unlike subject matter jurisdiction, is a waivable defect. *Petrowski v. Hawkeye-Security Insurance Co.,* 350 U.S. 495, 76 S.Ct. 490, 100 L.Ed. 639 (1956); Fed.R.Civ.Pro. 12(h)(1). Where a defendant does not raise the defense of lack of personal jurisdiction at the appropriate time in the district court, the objection is waived and the defendant is considered to have conferred jurisdiction by consent.[18] *See Rauch v. Day & Night Manufacturing Corp.,* 576 F.2d 697, 701 (6th Cir. 1978); *Zelson v. Thomforde,* 412 F.2d 56, 59 (3d Cir. 1969).

## IV. THE PRELIMINARY INJUNCTION

### A. The Framework for Review

▮ The appellants contend that the district court erred in entering the preliminary injunction against payment or receipt of payment on the NIRT-Melli guarantee letter of credit and against receipt of payment on the Melli-Continental letter of credit. The four prerequisites for the injunction are: (1) a substantial likelihood that the plaintiff will prevail on the merits; (2) a substantial threat that the plaintiff will suffer irreparable injury if the injunction is not granted; (3) threatened injury to the plaintiff must outweigh the threatened harm that the injunction may cause to the defendant; and (4) granting the preliminary injunction must not disserve the public interest. *S–1 v. Turlington,* 635 F.2d 342,

---

requirements is unnecessary once the narrower requirements for subject matter jurisdiction are found. *But see Texas Trading,* 647 F.2d at 307 ("Congress has only an incomplete power to tie personal jurisdiction to subject matter jurisdiction ... [since] its prerogatives are constrained by the due process clause," thus a separate due process inquiry is necessary.). We need not resolve this point, for our due process findings would be necessary to validate the exercise of jurisdiction through waiver by treaty. *See generally Harris,* 481 F.Supp. at 1059-60.

**18.** NIRT's objection to the court's exercise of jurisdiction over the parties was limited solely

to an attack on service of process, which we have already resolved against it. The objection to service of process does not preserve the issue of personal jurisdiction. Section 1330(b) states that service is necessary to acquire personal jurisdiction, thus making service of process a requisite to personal jurisdiction; however, that is not different from traditional jurisdictional concepts, *see generally, e.g.,* C. Wright, *Handbook of the Law of Federal Courts,* 301 (3d ed. 1976), and challenges to service remain, as always, distinct from challenges to jurisdiction over the person. *See* Fed.R.Civ.P. 12(b), 12(h)(1).

345 n. 4 (5th Cir.), *cert. denied,* 454 U.S. 1030, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981); *Canal Authority of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974). In reviewing these factors, a court must keep in mind that the granting of the preliminary injunction rests in the sound discretion of the district court and will not be disturbed on appeal unless there is a clear abuse of discretion. *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–2568, 45 L.Ed.2d 648 (1975); *S–1 v. Turlington,* 635 F.2d at 345.

### B. Substantial Likelihood of Success on the Merits

■ The merits of this case involve letter of credit law. Harris asserts that the existence of force majeure terminated its obligations under the contract with NIRT, making illegitimate NIRT's subsequent attempt to draw upon the performance guarantee issued by Melli. The appellants respond by relying upon a fundamental principle of letter of credit law: the letter of credit is independent of the underlying contract. *See generally* International Chamber of Commerce, Uniform Customs and Practice for Documentary Credits, General Provision and Definitions ¶ c (1974) (hereinafter "U.C.P.") ("Credits, by their nature, are separate transactions from the sales or other contracts on which they may be based and are in no way concerned with or bound by such contracts."); U.C.C. § 5–114 (Comment). Harris advanced two ways to overcome this barrier to enjoining a letter of credit transaction.

First, Harris asserts that the independence principle was modified by the parties here. It points to those paragraphs of its contract with NIRT which make "the bank guarantees" an "integral part" of the contract and which state that NIRT shall re-

lease all guarantees upon termination of the contract due to force majeure. *See notes 4 & 5 supra.* Harris contends that it has demonstrated a substantial likelihood that force majeure occurred and terminated both the contract and the guarantee. Harris cites *Touche Ross & Co. v. Manufacturers Hanover Trust Co.,* 107 Misc.2d 438, 434 N.Y.S.2d 575 (Sup.Ct.1980), *modified* 18 N.Y.L.J. 11 (May 5, 1981), where, under similar facts, the court enjoined payment on a guarantee letter of credit because it found that the underlying contract had been terminated by force majeure and held that the guarantee had thus been released.

We choose not to rely upon Harris's first line of argument, for we hesitate to hold that the letters of credit were automatically terminated by the operation of the contractual provisions. Accepting Harris's first argument would create problems; a bank could honor a letter of credit only to find that it had terminated earlier. While parties may modify the independence principle by drafting letters of credit specifically to achieve that result, *see generally* Note, *Guaranty Letters of Credit: Problems and Possibilities,* 16 Ariz.L.Rev. 822, 846–47 (1974), there is no assertion by Harris that the performance guarantee or the letter of credit contain provisions (conditions) which would modify the independence of the banks' obligations. Since the banks were not parties to the underlying contract, it would appear that the contractual provisions relied upon by Harris would have the same effect as a warranty by NIRT that it would not draw upon the letter of credit issued by Melli if the contract were to terminate due to force majeure.

■ The second avenue pursued by Harris is the doctrine of "fraud in the transaction." [19] Under this doctrine, a court may enjoin payment on a letter of credit, despite

---

**19.** As did the parties, we use the "fraud in the transaction" terminology broadly to encompass any type of fraudulent conduct in the letter of credit transaction. (U.C.C. § 5 -114(2) uses the term to describe a sort of fraud external to the

complying documents presented to an issuer as a part of a demand for payment on a letter of credit.)

The U.C.P. is silent on the availability of remedies to a plaintiff alleging that fraud is

the independence principle, where there is shown to be fraud by the beneficiary of the letter of credit. *See, e.g.,* J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code 735–37 (2d ed. 1980); Note, *"Fraud in the Transaction": Enjoining Letters of Credit During the Iranian Revolution,* 893 Harv.L.Rev. 992 (1980). Unfortunately, one unsettled point in the law is what constitutes fraud in the transaction, i.e., what degree of defective performance by the beneficiary justifies enjoining a letter of credit transaction in violation of the independence principle?

Contending that a narrow definition of fraud is appropriate, the appellants assert that an injunction should issue only upon a showing of facts indicating egregious misconduct. They argue that fraud in the transaction should be restricted to the type of chicanery present in the landmark case of *Sztejn v. Henry Schroeder Banking Corp.,* 117 Misc. 719, 31 N.Y.S.2d 631 (Sup. Ct.1941), where a seller sent fifty crates of "cowhair, other worthless material, and rubbish with intent to simulate genuine merchandise and defraud [the buyer]." 31 N.Y.S.2d at 633.

The appellants further contend that Harris does not and cannot allege conduct on the part of NIRT or Melli that would justify a finding of fraud under *Sztejn.* The egregious conduct, they assert, was by Harris. They state that it was Harris which failed to ship the remaining goods, unreasonably refused to extend the letter of credit obtained from Continental, and deliberately abandoned and destroyed the underly-

ing contract. In contrast, they point out that they informed Continental that they would have been satisfied if the letter of credit had been extended long enough for Harris to complete performance. According to the view of NIRT and Melli, all that Harris has—taking its assertions as true—is an impossibility defense to an action on the underlying contract.

■ Appellants' arguments are not persuasive in the context of this case. *Sztejn* does not offer much direct guidance because it involved fraud by the beneficiary seller in the letter of credit transaction in the form of false documentation covering up egregiously fraudulent performance of the underlying transaction. That does not mean that the fraud exception should be restricted to allegations involving fraud in the underlying transaction, nor does it mean that the exception should be restricted to protecting the buyer in the framework of the traditional letter of credit. The fraud exception is flexible, *e.g., United Bank v. Cambridge Sporting Goods Corp.,* 41 N.Y.2d 254, 260, 360 N.E.2d 943, 949, 392 N.Y.S.2d 265 (1976), and it may be invoked on behalf of a customer seeking to prevent a beneficiary from fraudulently utilizing a standby (guarantee) letter of credit. *See, e.g., Shaffer v. Brooklyn Park Garden Apartments,* 311 Minn. 452, 250 N.W.2d 172 (Minn.1977); *Dynamics Corporation of America v. Citizens and Southern National Bank,* 356 F.Supp. 991 (N.D.Ga.1973). *See generally* Note, *supra,* 93 Harv.L.Rev. 992.

Thus, the independent contracts rule does not make a fraudulent demand completely

---

involved in a beneficiary's demand on a letter of credit. Nonetheless, we are of the opinion that the "fraud in the transaction" doctrine as it has been developed in commercial law, and as it is now reflected in U.C.C. § 5–114(2), is applicable in a case such as this, where the appellants have not alleged and shown that foreign law controls and makes resort to the doctrine impermissible. *Cf. KMW International v. Chase Manhattan Bank,* 606 F.2d 10, 15 n. 3 (2d Cir. 1979) (applicability of U.C.P. rather than U.C.C. "does not . . . take away from the point that apparent 'fraud in the transaction' or fraudulent documentation may be a defense

under either the U.C.C. or the U.C.P."); *United Bank Ltd. v. Cambridge Sporting Goods Corp.,* 41 N.Y.2d 254, 360 N.E.2d 943, 947 n. 2, 392 N.Y.S.2d 265 (1976) ("The Uniform Customs and Practice, where applicable, does not bar the relief provided for in section 5–114 of the code."). Other courts in the United States have consistently reached this result. *See* Comment, *Enjoining the International Standby Letter of Credit: The Iranian Letter of Credit Cases,* 21 Harv. Int'l L.J. 189, 202–03 & n. 69 (1980) (criticizing the courts for failing to consider that foreign law might apply).

irrelevant to a bank's obligation to honor a standby. The differences between the allegations in this case and those in *Sztejn* merely require us to focus on the conduct of the buyer rather than the seller as we evaluate the beneficiary's conduct in light of the terms of the particular documents involved in the demand.

In order to collect upon the guarantee letter of credit, NIRT was required to declare that Harris had failed to comply with the terms and conditions of the contract. Harris contends that NIRT intentionally misrepresented the quality of Harris's performance; Harris thus asserts fraud as it has been defined traditionally.

■ We find that the evidence adduced by Harris is sufficient to support a conclusion that it has a substantial likelihood of prevailing on the merits. The facts suggest that the contract in this case broke down through no fault of Harris's but rather as a result of problems stemming from the Iranian revolution. NIRT apparently admitted as much during its negotiations with Harris over how to carry out the remainder of the contract. Nonetheless, NIRT sought to call the performance guarantee. Its at-

tempt to do so necessarily involved its representation that Harris had defaulted under the contract. Yet the contract explicitly provides that it can be terminated due to force majeure.[20] Moreover, NIRT's demand was made in a situation that was subtly suggestive of fraud. Since NIRT and Bank Melli had both become government enterprises, the demand was in some sense by Iran upon itself and may have been an effort by Iran to harvest undeserved bounty from Continental Bank. Under these circumstances, it was within the district court's discretion to find that, at a full hearing, Harris might well be able to prove that NIRT's demand was a fraudulent attempt to obtain the benefit of payment on the letter of credit in addition to the benefit of Harris's substantial performance.[21] Cf. *Touche Ross & Co.*, 434 N.Y.S.2d at 577 ("As a result [of cancellation of the contract due to force majeure], the guaranty has been released, and no legitimate call could be made on the guaranty or the letter of credit.").

### C. Irreparable Injury

The district court did not abuse its discretion in finding a substantial likelihood of

**20.** See note 5 *supra.* Melli points out that the provision requires written notice within ten days of force majeure in order to terminate the contract and argues that Harris did not attempt to give such notice to NIRT until July 23, 1980, well after the Iranian revolution and NIRT's demand on the guarantee. The facts suggest, however, that Harris initially did not consider the force majeure to constitute anything more than cause for delay under the contract. Apparently, only after Harris learned that NIRT had presented Melli with a written declaration of Harris's default (in June of 1979) did Harris realize that NIRT considered continued operations impossible and determined that force majeure prevented completion of the contract. By that time, of course, NIRT had received notice of force majeure and had apparently acknowledged its existence, see pp. 1347–1348 *supra,* thus NIRT might be deemed to have waived any further notice required under the contract. This sequence of events sufficiently shows that NIRT's demand on the guarantee letter of credit was made with actual knowledge of the existence of conditions that excused further performance by Harris.

**21.** The appellants have, of course, cited other cases involving Iranian letters of credit where

courts have found that the "fraud in the transaction" exception did not apply. The cases presented, however, do not involve the same, or even a very similar, combination of the beneficiary's conduct, the terms of the contract, and the terms of the demand document as we have before us. *See, e.g., KMW Int'l v. Chase Manhattan Bank,* 606 F.2d 10 (2d Cir. 1979) (no demand on the letter of credit); *American Bell Int'l, Inc. v. Islamic Republic of Iran,* 474 F.Supp. 420, 424–25 (S.D.N.Y.1979) (insufficient showing of fraud where letter of credit provided for immediate payment on demand, without regard to cause); *United Technologies Corp. v. Citibank,* 469 F.Supp. 473 (S.D.N.Y. 1979) (no recognition by beneficiary of any condition excusing contract performance); *Balfour Machine Int'l, Ltd. v. Manufacturers Hanover Trust Co.,* No. 20801/78 (N.Y.Sup.Ct., N.Y. County July 13, 1979) (lacked requisite allegations of fraud). *See generally* Comment, *supra* note 19, 21 Harv. Int'l L.J. at 248–52. We reject any implication, purportedly drawn from the opinions in such cases, that an injunction should not be available under the facts of this case.

irreparable injury to Harris absent an injunction. Harris has sufficiently demonstrated that its ability to pursue a legal remedy against NIRT and Melli (*i.e.,* to recover the proceeds of the standby) has been precluded. It is clear that the Islamic regime now governing Iran has shown a deep hostility toward the United States and its citizens, thus making effective access to the Iranian courts unlikely. *See American Bell International v. Islamic Republic of Iran,* 474 F.Supp. 420, 423 (S.D.N.Y.1979). Similarly, the cooperative response of agencies of Iran to orders of a United States court would be unlikely where the court's order would impose a financial obligation on the agencies. *See generally* Comment, *supra* note 19, 21 Harv. Int'l L.J. at 227–33 (1980). Harris's possible resort to the Iran-United States Claims Tribunal does not, in our eyes, ameliorate the likelihood of irreparable injury for purposes of this requirement for preliminary relief.

### D. The Balance of Harms

Neither appellant argues that the preliminary injunction has caused or will cause it any harm. Since there would otherwise be a likelihood that Harris would suffer irreparable injury, the balance of harms weighs heavily in Harris's favor.

### E. The Public Interest

In a Statement of Interest filed with the district court on July 16, 1982, the United States indicated, that new amendments to the Iranian Assets Control Regulations governing letter of credit claims still permit American litigants to proceed in United States Courts and to obtain preliminary injunctive relief. The supplementary information explaining the changes provides a good indication that preliminary injunctions such as the one entered here are in the public interest:

Iran filed more than 200 claims with the Iran-U.S. Claims Tribunal (the "Tribunal") based on standby letters of credit issued for the account of United States parties. United States nationals have filed with the Tribunal a large number of claims related to, or based on, many of the same standby letters of credit at issue in Iran's claims. Other United States nationals have litigation pending in United States courts concerning some of these same letters of credit.

The purpose of the amendment is to preserve the status quo by continuing to allow U.S. account parties to obtain preliminary injunctions or other temporary relief to prevent payment on standby letters of credit, while prohibiting, for the time being, final judicial action permanently enjoining, nullifying or otherwise permanently disposing of such letters of credit.

Preservation of the status quo will provide an opportunity for negotiations with Iran regarding the status and disposition of these various letter of credit claims. Preservation of the status quo for a period of time also permits possible resolution in the context of the Tribunal of the matters pending before it. The amendment will expire by its terms on December 31, 1982.

Supplementary Information, Iranian Assets Control Regulations, "Judicial Action involving standby letters of credit," to be codified at 31 C.F.R. §§ 535.222(g) and 535.-504 (July 1, 1982).

Melli has charged, however, that the entry of a preliminary injunction here would threaten the function of letters of credit in commercial transactions. Admittedly, that has given us pause, for it would be improper to impose relief contrary to the intentions of parties that have contracted to carry out their business in a certain manner. Some might contend that the use of the fraud exception in a case such as this damages commercial law and that Harris could have chosen to shift the risks represented in this case. Under the circumstances, however, we disagree. First, the risk of a fraudulent demand of the type which Harris has demonstrated a likelihood of showing is not one which it should be expected to bear in light of the manner in

which the documents in this transaction were structured. Second, to argue that Harris could have protected itself further by inserting special conditions in the letters of credit and should be confined to that protection is to ignore the realities of the drafting of commercial documents. Third, unlike the first line of argument presented by Harris, the issuance of a preliminary injunction based on a showing of fraud does not create unfortunate consequences for a bank that honors letters of credit in good faith; it is up to the customer to seek and obtain an injunction before a bank would be prohibited from paying on a letter of credit. Finally, foreign situations like the one before us are exceptional. For these reasons, the district court's holding is not contrary to the public interest in maintaining the market integrity and commercial utility of guarantee letters of credit.

## V. CONCLUSION

The requisite jurisdictional elements either exist in this case or have been waived, and the requirements for preliminary injunctive relief have been met. Accordingly, the decision of the district court is

AFFIRMED.