**WEIDNER COMMUNICATIONS INC., a Utah corporation, Plaintiff,**

v.

**H.R.H. Prince Bandar Al FAISAL, H.H. Princess Basma Bint Majid Bin Abdul Aziz, H.R.H. Prince Saud Abdullah Al Faisal, Ali Fissa Belkairous, The Saudi Group, an entity formed under the laws of Saudi Arabia, and Saudi Computer Aided Translation, Ltd., an entity formed under the laws of Saudi Arabia, Defendants.**

No. 86 C 7578.

United States District Court,
N.D. Illinois, E.D.

Sept. 8, 1987.

Harry P. Lamberson, David B. Sarritt, Davit T.B. Audley, Chapman & Cutler, Chicago, Ill., for plaintiff.

William E. Kelly, Pope, Ballard, Shepard & Fowle, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

WCC seeks more than fifty million dollars in actual damages and not less than one hundred million dollars in punitive damages as well as costs and attorney's fees from Prince Bandar, Princess Basma, Prince Saud, Belkairous, SG and SCAT.[1] Jurisdiction is based on undisputed diversity of citizenship for claims of contract breach, common law fraud, restitution, conversion, and intentional interference with contract. Jurisdiction also is founded on a claim for relief under the federal RICO law. Against Belkairous there are two further counts, one for breach of a confidentiality and non-competition agreement and the other for intentional interference with contract.

Before the court is an extensively briefed motion to dismiss, and the facts recited are those alleged by WCC and those derived from an examination of the unchallenged exhibits filed by the parties.

WCC, a Utah corporation, has its principal office in Northbrook, Illinois. Prince Bandar and his wife, Princess Basma, are subjects of the Kingdom of Saudi Arabia and reside both there and in Aspen, Colorado. Prince Saud is also a Saudi Arabian and resides in the Kingdom. SG is a joint venture, existing under Saudi law, comprised of Prince Saud, Prince Bandar, Princess Basma and other unknown persons or enterprises. So, too, SCAT is an entity under Saudi law owned and controlled by SG and the persons who comprise SG. Belkairous is a citizen of Algeria, residing in Saudi Arabia and maintaining a residence in Chicago, Illinois.

WCC develops computer aided systems for translating languages to and from English and, on February 22, 1985, was sole owner of the Product at issue here, a system it developed for translating English into Arabic.

In July of 1984 the Saudi defendants (Prince Bandar, Princess Basma, Prince Saud and SG) engaged one Rittenberry to serve as their agent to find an English to Arabic computer aided translation system. Later that summer Rittenberry and a computer expert visited WCC's offices to meet with WCC's president Garrett and observe a demonstration of the Product. As a result of Rittenberry's report of his findings Prince Bandar became interested in the Product and asked to send three experts from Saudi Arabia to WCC's offices to look again at the Product. WCC agreed, and in mid-October of 1984, Rittenberry and three Saudi experts spent three days at WCC's Northbrook offices examining the computer source code, discussing the system with WCC's staff and putting many pages of text through the system.

A Letter of Intent dated and effective on October 30, 1984 was made between WCC and "Prince Bandar al Faisal a Saudi Arabian National, hereinafter referred to SG" (sic). It provided essentially that "WCC and the Saudi Group (SG) will form a new company in Saudi Arabia named ... (SCAT)" for the purpose of selling and leasing computer aided translation systems and software and operating translation service bureaus. SCAT was to acquire the worldwide marketing rights to the Product, and its stock was to be owned by SG (51%) and WCC (49%) with SG to provide $510,000 and WCC to provide $490,000, each from its own resources to be used as SCAT's working capital. SCAT was to borrow $2,500,000 at the current U.S. prime rate of interest from SG to be repaid from the initial profits of SCAT prior to any

---

1. Plaintiff is Weidner Communications, Inc., also known as Weidner Communications Corporation ("WCC"). Defendants are H.R.H. Prince Bandar Al Faisal ("Prince Bandar"), H.H. Princess Basma Bint Majid bin Abdul Aziz ("Princess Basma"), H.R.H. Prince Saud Abadullah Al Faisal ("Prince Saud"), Ali Fissa Belkairous ("Belkairous"), The Saud Group ("SG") and Saudi Computer Aided Translation, Ltd. ("SCAT").

distribution of dividends. Payment of interest on the $2,500,000 appears to have been WCC's obligation to SG. The $2,500,000 itself was to be paid by SCAT to WCC to acquire the marketing rights to the Product. SCAT was obligated to commence marketing the Product immediately after acquisition and was obliged to pay WCC for any new software conversion or development.

All sales of the Product were to be made through SCAT. WCC was to work closely with SCAT and SG to establish and manage SCAT; to provide necessary software and updates; system and user support; to train SCAT personnel, all in Riyadh, Saudi Arabia. SG was to provide (1) administrative personnel until SCAT personnel could perform these duties, (2) sales leads, contacts and introductions, and (3) other marketing assistance agreed to by SG and WCC. All direct personnel costs of assisting SCAT were to be repaid by SCAT and nothing was to be spent on SCAT's behalf without its prior approval. The Letter of Intent included a schedule which required, upon signing of the Letter, that SG pay WCC $100,000 and secure Saudi registration of SCAT and that WCC hire and train technical and administrative personnel, purchase DEC hardware and software and step up development of English–Arabic dictionaries. Upon Saudi registration of SCAT, SG was to pay $2,400,000 to WCC which would then pay $490,000 into SCAT as working capital and receive 49% of SCAT in exchange for the $490,000.

From October 30, 1984 WCC endeavored to fulfill its obligation under the Letter of Intent. In January of 1985 Rittenberry and three attorneys, Mitchell, Murphy and O'Reilly, all of whom represented the Saudi defendants, met with Garrett at the WCC office in Northbrook in an attempt to document formally the relationship set forth in the Letter of Intent. In early February 1985, Mitchell, Murphy and O'Reilly returned to WCC offices with a DEC systems expert who verified that the Product software was well done.

Personal negotiations between Garrett and all the Saudi defendants, save Prince Saud who was represented by the other Saudi defendants, occurred over four days in mid-February, 1985 at Aspen, Colorado. Other meetings were held later in Paris, France, and Riyadh, Saudi Arabia, and Prince Saud was present at some or all of them.

At these meetings, Prince Bandar, Prince Saud and SG told Garrett of the great need for the Product and that through their family, personal and political connections SCAT would have translation service revenues of at least $22,000,000 per year. They told Garrett that the entities which would provide the business to WCC were spending $90,000,000 a year in manual translation. The defendants' assurances of future income were made to induce WCC to enter into a business relationship and thus make certain defendants' access to and exclusive use of the WCC Product.

On or about February 22, 1985 WCC and SG signed a Joint Venture Agreement and an Agreement for the Sale of the Computer Program. Garrett signed for WCC, and Princess Basma signed for SG. At the negotiations over the agreements each of the Saudi defendants told WCC that SG and its principals would perform each of its obligations in the agreements.

The Joint Venture Agreement is a formal agreement embodying, largely, the same terms as the Letter of Intent. There are some differences. The ownership of SCAT was to be vested at 51% in SG, 43% in WCC, 5% in Rittenberry, and 1% in one Abadullah. WCC would pay $430,000 for its share. The prior payment of $100,000 to WCC was noted.

The Joint Venture Agreement provided the usual assurances that WCC had full rights to the Product which it would deliver to SCAT (including source code, software, technology and any trade secrets). Belkairous was identified as the WCC leader on the team developing the Product. WCC was required promptly to get a firm delivery commitment for the necessary computer hardware and to arrange for its installation within thirty days of delivery and, finally, to establish the Product running in

good operating condition at the time of equipment installation.

SG's obligations were also set forth, part of which was that:

> U.S. $2,400,000.00 shall be paid to WCC upon the date WCC delivers the Product to the company offices in Saudi Arabia, and after receipt of confirmation and subject to acceptance in writing by the Company that the English to Arabic system has been delivered, installed and is running pursuant to Section 5.2 (d) and Section 2.4.

The separate sale agreement did not materially add to these terms.

Prior to September 1985, WCC incurred expenses and devoted significant effort in developing and installing the Product, establishing SCAT offices in Riyadh, and training personnel. WCC purchased a license for a Fortran compiler from DEC in order to improve the Product (for which it would receive additional compensation from SCAT). SG expressed an interest in acquiring the Fortran license but was told by WCC that its agreement with DEC precluded this. By September 5, 1985, WCC had complied with the terms of the Joint Venture and the Sale agreements.

About a week thereafter the complaint alleges:

> Defendant Prince Bandar invited Garrett to his palatial home for a meeting, ostensibly to show his gratitude to Garrett and WCC for the successful development, delivery and installation of the Product. Previous to this meeting, Prince Bandar had requested his employees to take Garrett to the town square in Riyadh, Saudi Arabia, where punishment was publicly inflicted upon criminals. At the meeting, Prince Bandar, acting on his own behalf and on behalf of the Saudi Defendants, initially discussed with Garrett the [recent] beheading of three persons * * *, and then threatened and intimidated Garrett, at which point Prince Bandar initiated a negotiation with Garrett in which he insisted that WCC agree to accept a drastic reduction in the monies and compensation to which it was entitled under the Agreements.

WCC claims this was done to intimidate Garrett in order to extort settlement under the agreements to which the Saudi defendants were not entitled. Garrett, however, refused to agree. The complaint further alleges:

> Garrett, perceiving the obvious threat posed to his own personal safety and well-being and realizing that it would be useless to further demand the immediate payment of the compensation to which WCC was entitled or the return of the Product (and the source code and components), left Prince Bandar's palatial home and immediately took a plane back to the United States. Garrett has refused to return to Saudi Arabia because of the present and real danger for his personal safety and well-being.

WCC demanded payments repeatedly and threatened litigation but defendants refused. Knowing that WCC incurred substantial expenses for the services it performed to date, defendants offered to pay the remainder due under the joint venture agreement if WCC would perform additional services not required under the Joint Venture Agreement, i.e., interfacing a new Wang word processor.

In early October, 1985 Mitchell, Murphy and O'Reilly met with Garrett and WCC's lawyer in Northbrook to resolve WCC's claims. On October 14, Mitchell returned for further discussion about payments and additional services. WCC was paid $700,-000 at the meeting.

On October 15, 1985 a written agreement, the clarification agreement, was signed by WCC (Garrett) and SG (Prince Saud). It referred to the past agreements. It stated that WCC believed it had performed its obligations and was due $1,700,-000 while SG believed WCC had not performed but was willing to pay $700,000 to induce WCC to comply with the remaining obligations under past agreements. The text set forth the sole remaining matters to be completed under the agreements after which WCC was to be paid, to wit, SG must acquire a Wang processor and related equipment to meet WCC's specifications; WCC must develop an interface from its

system to the Wang system; SCAT will purchase a Fortran Compiler from the Saudi distributor for DEC to meet WCC's specifications; all this to be done within four months of October 15, 1985 and time was of the essence. When WCC notified SCAT that it had completed these tasks and that it was prepared to make final delivery to SCAT, the sum of $570,000 was to be paid to WCC's counsel, Lamberson. After receiving this sum WCC was to deliver and install the equipment at SCAT's offices in Saudi Arabia. Upon written verification by Tom Cassell (SCAT's general manager) or SCAT's president that the interface was satisfactorily operating the remaining $1,130,000 would be paid to Lamberson. It was further agreed that $430,000 of the final $1,130,000 was to be given to SCAT as WCC's contribution to SCAT's working capital and $700,000 was to go directly to WCC. The payments were to be secured by an irrevocable letter of credit to be paid in two installments, the first to be paid upon WCC's statement to the bank of completion and the second to be paid upon SCAT's certification of satisfactory operation.

By December 5 WCC certified completion and received $570,000.

On February 4, 1986, Prince Saud wrote Garrett that SCAT received a $430,000 capital contribution in WCC's behalf which entitled WCC to a 43% equity in SCAT. No certificate of stock was conveyed to WCC. WCC further alleges no certificate was ever issued, that Prince Saud's representation was false and designed to deceive WCC and induce the delivery and installation of the interface. In the latter part of February one of WCC's employees was sent to SCAT in Riyadh and, overcoming hardware problems not of WCC's making, he installed the interface. The interface and Product have operated satisfactorily every since. Despite repeated demands from March 10, 1986 on SCAT and Mitchell, for payment and a stock certificate, neither has been delivered. On April 16, 1986

Prince Saud refused to sign a certificate of satisfactory operation.

WCC claims further that defendants have refused to return the Product and its related technology, and contrived alleged non-existent shortcomings in the Product. Moreover SCAT has employed Belkairous and Belkairous has used expertise and knowledge of the Product, which he gained as a WCC employee, in direct violation of his agreement of non-disclosure and non-competition he signed with WCC on July 11, 1986. WCC essentially alleges that defendants induced WCC to train Belkairous and then directed Belkairous to steal a Fortran compiler and other proprietary and confidential information and bring it to SCAT where it is currently being used. The defendants Prince Bandar, Prince Saud and SCAT have moved to dismiss.[2] They claim the absence of personal jurisdiction, failure of proper service and failure to state a claim upon which relief can be granted.

On a motion to dismiss there is no dispute about the facts alleged by the complaint although it can be fairly inferred that should the case be tried the defendants will argue that the plaintiff has been paid over $1,300,000 for a translation system that does not work as promised.

■■■■ Defendants argue that the case belongs in Saudi courts pursuant to the terms of the clarification agreement. A forum selection clause is to be enforced unless it is shown to be unreasonable and its enforcement is specially favored in cases of international commerce. *Bremen v. Zapata*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). There are really two kinds of clauses before us. In the Joint Venture Agreement it is said "any dispute concerning the terms of this agreement shall be determined by Saudi Arabian jurisdiction." Plaintiff notes correctly that this is not an *exclusive* jurisdiction clause, it simply provides for submission to jurisdiction should a suit be filed there. This is of no consequence here since defendants rely

---

**2.** There has been no purported service of process on Princess Basma or SG. Defendants assert SG is not a separate legal entity but merely a business venture of Princess Basma.

not on this provision but upon section 5 of the clarification agreement which reads:

> The parties further covenant and agree that from and after the time that all payments due under this Agreement have been paid to WCC in full, in any action or proceeding brought by SG or WCC or any party claiming through them, directly or indirectly, and whether or not brought under the Joint Venture Agreement, as well as the Agreement of February 22, 1985, or the Promissory Note or in this Agreement or any other agreements relating to the acquisition and installation of the English to Arabic Source code, the parties shall and do hereby waive trial by jury and agree that the Courts of Saudi Arabia shall have exclusive jurisdiction of any such action or proceeding and that Saudi Arabian law will apply in any such action or proceedings.

This clause does confer exclusive jurisdiction and plaintiff offers four reasons to preclude its application.

■ First, WCC claims that it fails to apply until all payments due under the clarification agreement have been paid to WCC in full and that WCC has not been paid in full. Defendants respond that all which needs payment in full are payments due and that the final installment is not due. The Court agrees with defendants on both aspects of its response. The clause may take effect before every dollar called for in the clarification agreement is paid, so long as every dollar then due has been paid. Whether the dollar is due under the clarification agreement is resolvable on the face of the pleadings and undisputed exhibits. The second payment to WCC is due "upon submission by Tom Cassell or the then acting President of [SCAT] to the issuing bank of a statement certifying that delivery and installation ... of the interface ... has been completed and is operating satisfactorily." (October 15, 1985 Clarifying Agreement, section 3). No such submission is alleged to have occurred. In Tom Cassell's affidavit, filed by plaintiffs as an exhibit to its response to the dismissal motion, there is no claim that he ever

submitted the statement which is a precondition of payment, though he remained as SCAT's general manager until May, 1986.

■ Second WCC argues that defendant SCAT, by filing a suit against WCC in the United States District Court for the Southern District of New York (86 Civ. 9207) alleging breach of contract, and of warranties and misrepresentations, acknowledges that the clause in question does not require litigation of all disputes in Saudi Arabia. This Court takes judicial notice of the fact that in New York, Judge Leval ordered the case against WCC transferred to this Court after which SCAT dismissed its suit under Fed.R.Civ.P. 41(a). The act of Defendant SCAT in filing a suit in federal court in New York does not establish anything about the meaning of the contract clause at issue here. WCC could have chosen to invoke the clause in New York though it is fair to say this seems unlikely and, in any event, the provisions of the clause could be ignored if all parties to the case chose to do so. Here the defendants have invoked the clause and the Court finds they are entitled to do so.

■ Third WCC argues that the forum selection clause may be ignored because Saudi Arabia will not provide a neutral forum for adjudication of claims against members of the Saudi royal family. This claim is made but not shown and the plaintiff must do more than assert he will be treated unfairly. The cases involving Iranian courts are not apposite. The absence of diplomatic relations between the United States and Iran and the problems created by an ongoing war between Iran and Iraq made Iranian courts an unsuitable forum. *McDonell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 346 (8th Cir. 1985); *see also Harris Corp. v. National Iranian Radio and Television*, 691 F.2d 1344, 1357 (11th Cir.1982) (deep hostility of Iran toward the United States). The United States does have diplomatic relations with Saudi Arabia, the background of unrelenting hostility between the two nations is not and could not be alleged to exist and Saudi Arabia is not at war. The Court believes Saudi Arabia is a small country

with limited industrial and technological capacity yet possessing large amounts of capital. It necessarily must purchase a very large proportion of goods and services on the international market and has, as a result, a significant commercial incentive to provide fair adjudication in its courts to foreigners with whom it trades. Regardless of this view, however, there is no showing here that the fact of defendants' association with the Saudi royal family will cause Saudi courts to treat plaintiff unfairly. Indeed the circumstances surrounding the agreement to the clause indicate that not even plaintiff believes this to be so.

The clause was agreed to after the intimidating acts of Prince Bandar but while Garrett was in the United States. Assuming, moreover, that plaintiff reads the clause rightly, he agreed to Saudi judicial resolution of matters of great financial significance such as divisions of profits on the expected twenty million dollars or so of annual sales.

The forum selection clause came into being in the October 15, 1985 clarification agreement when, it can clearly be inferred, WCC was represented by the same lawyer who appears as its lead counsel in this case. *Prior* to October 15, 1985 WCC tells us in its complaint that it "made repeated demands for the payments ... and threatened litigation." In short, the forum selection clause was agreed to by WCC when it had already contemplated litigation. It acceded to Saudi jurisdiction when relations between the parties clearly indicated that litigation between them was a real possibility. This is precisely the sort of arms-length agreement between businessmen that *Bremen v. Zapata*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), requires that we enforce.

■ Fourth, plaintiff argues that its tort claims are not covered by the forum selection clause. In this case, the Court finds they are. The entire case whether pleaded in contract or tort hinges upon breach of the agreements between the parties. This is, in all respects, an action to declare that rights created by contract have been breached and to assess penalties against the defendants for breaching it—the tort claims are too closely related to the contract to be treated as truly independent. *See Clinton v. Janger*, 583 F.Supp. 284, 287 (N.D.Ill.1984).

Having reached this conclusion I decline generally to rule upon the remaining issues. One ground, the lack of jurisdiction under the long arm statute and under the due process clause may well require the taking of evidence (Fed.R.Civ.P. 12(b)(2), and 56) to determine whether Rittenberry, the Saudi computer experts, or the attorneys Mitchell, Murphy and O'Reilly were agents of the defendants. The questions of whether process was properly served may also require the taking of evidence. Discussion of the remaining issues, though purely matters of law, are now unnecessary to the disposition of the case and would have, I believe, no significant value as precedent.

Finally there has been no purported service of process upon Princess Basma or SG. The provisions of Fed.R.Civ.P. 4(j) requiring service of process within 120 days apparently do not apply to these defendants, but they are protected by the same forum selection clause as the other defendants.

For the reasons stated, the complaint is dismissed as to all defendants and the plaintiff is remitted to his remedy in Saudi Arabian courts. With respect to Princess Basma and SG the complaint may be refiled upon the condition that such filing is accompanied with a waiver by those defendants of their rights under the forum selection clause.